IOTA MANAGEMENT CORP., United Associates, Inc., Arthur Loomstein, and David Weil, d/b/a Parklin Associates, a Missouri Limited Partnership, Plaintiffs and Counterclaim-Defendants/Respondents,

and

Kay Loomstein, Counterclaim-Defendant/Respondent,

v.

BOULEVARD INVESTMENT COMPANY, Defendant and Counterclaim-Plaintiff/Appellant,

and

Madesco Investment Corp., Defendant/Appellant,

and

Norman K. Probstein, Defendant.

No. 49817.

Missouri Court of Appeals, Eastern District, Division Three.

April 28, 1987.

Motion for Rehearing and/or Transfer Denied June 2, 1987.

Application to Transfer Denied July 14, 1987.

John R. Musgrave, Ellen E. Bonacorsi, Ronald L. Hack, Coburn, Croft, Putzell, St. Louis, for appellants.

Robert F. Summers, Bryan L. Hettenbach, Summers, Compton, Wells & Hamburg, Clayton, for respondents.

SNYDER, Chief Judge.

Madesco Investment Corporation and its wholly owned subsidiary, Boulevard Investment Co., appeal from a judgment in favor of respondents in which the trial court found appellants liable for breach of a sales agreement and constructive fraud in connection with appellant Boulevard's sale of a hotel to respondents. The judgment is affirmed.

This action arose from the sale of the Bel Air West Motor Hotel by appellant Boulevard to respondents. Respondents alleged in their petition actual fraud (Count I), constructive fraud (Count II), and wrongful foreclosure (Count III) against appellant Boulevard and Norman Probstein. Respondents also alleged breach of contract (Count IV) and sought the return of expenses and monies due (Count V). In addition, respondents sought to have a constructive trust imposed against appellant Madesco (Count VI). Appellant Boulevard counterclaimed for breach of the sales contract and related agreements against respondents (Counts I–IV), for unjust enrichment against respondents, (Count V), and for breach of a guarantee against respondents Loomstein and Wiel and counterclaim-defendant respondent Kay Loomstein.

The trial court entered its judgment for respondents on Counts II, IV, V, and VI and entered judgment against appellant Boulevard on all six counts of its amended counterclaim.

Appellants have challenged the sufficiency of the evidence in several of their twelve points on appeal. Therefore, a summary of the voluminous trial evidence will be helpful.

On March 31, 1981, appellant Boulevard and respondents executed an agreement for the sale of the Bel Air West Motor Hotel located in the City of St. Louis. Appellant Boulevard is a wholly owned subsidiary of appellant Madesco. Norman Probstein was the president and a director of Boulevard, as well as chairman of the board of directors of Madesco.

Parklin Associates, a limited partnership, was the entity designated as the purchaser in the sales agreement. Respondents Iota Management Corporation, United Associates, Inc., Arthur Loomstein, and David Wiel were general partners in Parklin.

Parklin's attorney, Ron Compton, and Boulevard's attorney, Eugene Portman, engaged in a series of negotiations concerning the sale of the Bel Air West. Portman expressed throughout the negotiations that the sale of the hotel would be an "as is" sale and that Parklin should inspect the hotel to ascertain its condition.

The sales agreement provided that Boulevard would sell the hotel and all the personal property within the hotel to Parklin for $1,750,000.00, with $600,000.00 to be paid at closing. The agreement included:

Section 4.1. *Condition of Hotel.* Seller makes no representations or warranties as to the condition of the Hotel, other than as contained herein; rather, Seller is selling the Hotel "as is." Purchaser, therefore, shall have 21 days from the date of execution of this Agreement to have the Hotel inspected and examined by its architects, service representatives, engineers, or contractors. Within said 21–day period, Purchaser shall have the right to terminate this Agreement if, based upon sound engineering advice, or in Purchaser's good faith opinion, any substantial portion of the Hotel is determined to be in an adverse condition.

Section 8.4. *Condition of Hotel.* Seller has no actual notice of any substantial defect in the structure of the Hotel or in any of its plumbing, heating, air-conditioning, electrical, or utility systems.

Section 15.1. All representations and warranties set forth in this Agreement shall survive the Closing and thereafter shall be fully effective and enforceable, and shall not be affected by any investigation, verification, or approval by any party or anyone on behalf of such party.

Probstein, the president of Boulevard, learned of the existence of § 8.4 of the agreement prior to its execution, but testified that he had no actual notice of any substantial defect in the structure or systems of the hotel.

The agreement was executed on March 31, 1981, but amended on June 17, 1981. The amendment, among other things, changed the closing date from July 1, 1981, to July 8, 1981, changed the terms of payment, and also provided for a personal guarantee by Mr. and Mrs. Arthur Loomstein and David Weil.

After the agreement was executed, Loomstein conducted a room inspection and inventory of the personal property. In addition, Phil Bassin, a vice president of Centerco, a building management company of which Loomstein was the president and principal shareholder, inspected the hotel's rooms to determine what cosmetic improvements would be necessary.

Loomstein also hired Thomas Kirk, a registered professional engineer, to inspect the structural condition of the hotel and the heating and air conditioning system. Kirk visited the hotel six to ten times during the week of April 8, 1981, when the air conditioning system was not in operation, and was accompanied by Boulevard's maintenance supervisor, Cecil Lillibridge.

The principal heating and cooling system at the hotel was a closed-loop water circulation system. A set of self contained pipes circulated heated or cooled water throughout the hotel to fan coil units located in guest bathroom ceilings where air was blown across the heated or cooled coils. The water heating and cooling units were located in the boiler room of the basement of the hotel. Pipes ran vertically from the basement to the three floors of the hotel through narrow concealed spaces called pipe chases or risers. Supply and return

pipes called mains and run outs branched off horizontally from the risers and ran above the hotel corridor ceilings.

The pipes in the closed-loop system were insulated with fiberglass, Armaflex, Rubatex or asbestos. Armaflex and Rubatex are trade names for pipe insulation. The pipes were insulated to provide a vapor barrier so that condensation would not form on the pipes.

The mains in the hotel were covered with either fiberglass or Armaflex; the closed-loop pipes in the risers were insulated with either asbestos or Armaflex; and closed-loop pipes in the boiler room were covered with fiberglass. Cecil Lillibridge, Boulevard's maintenance supervisor, from what he could see of the exposed insulated pipe, estimated that 10% of the insulation in the hotel is Armaflex located mainly on the pipes in the bathroom ceilings. He was unable to see or inspect much of the pipe because it was concealed.

In addition to the closed-loop system, two direct expansion heating and cooling units serviced the hotel's restaurant and the Phillips Room, a meeting room. The hotel lobby and other areas of the hotel, including the lounge, were heated and cooled by air carried through metal ductwork.

Kirk, the registered professional engineer, prepared a report for Loomstein in which he cited staining in the bathroom ceilings which he attributed to condensation from the cooling units and steam and condensation from the bathroom showers. He also reported stains on the third floor ceilings which he believed were caused by inoperative exhaust vents on fans on the roof. Kirk looked at some closed-loop pipe during his inspection but did not touch or examine it. Kirk prepared a report in which he stated that the heating and air-conditioning system was in excellent condition, except that the chiller insulation needed to be repaired and that a 60 ton unit that provided heating and cooling to the lobby and restaurant would need to be replaced in about two years because of considerable corrosion and resulting reduced efficiency.

After reviewing the Kirk report, Loomstein instructed Frank Huseman, an air-conditioning specialist to examine the air-conditioning chiller in the boiler room. Loomstein did not order any further inspections of the ceiling stains.

Loomstein reviewed the reports he received from Kirk, Bassin and Huseman prior to the expiration of the twenty-one day inspection period referred to in § 4.1 of the sales agreement. There were no allegations that access to any portions of the hotel were denied to Loomstein or anyone working for him.

In June of 1981, the parties approved an amendment to the sales agreement. The cash payment at closing was reduced from $600,000.00 to $200,000.00. Boulevard took back a promissory note from Parklin in the amount of $1,550,000.00. The terms of the note called for monthly interest payments of $6,000.00 each beginning in August, 1981, and for payment of $400,000.00 in principal on January 29, 1982. A personal guarantee was made by Loomstein, his wife Kay, and Weil on the $400,000.00 principal amount.

The sale was closed on July 8, 1981. Loomstein and Weil executed the Part Purchase Leasehold Deed of Trust and Security Agreement on behalf of Parklin, and Probstein represented Boulevard. Loomstein, Kay Loomstein, and Weil executed their personal guarantee that the principal installment would be paid.

On the date of closing, July 8, 1981, possession of the real and personal property was transferred from Boulevard to Parklin Associates. A list of personal property to be transferred included an agreement that each guest room had a television set and that three sets of linen would be delivered to Parklin at closing. An inventory of personal property was made at closing and an adjustment was made at that time for missing items.

Prior to closing, respondents had no knowledge of defects in the hotel's heating and air-conditioning systems, except those mentioned in Mr. Kirk's report. As respondents began remodeling they noticed numerous drips. An inspection of the leaks

revealed rusted closed-loop pipe and cracked and brittle insulation in the lobby ceiling above the front desk and hallway and in the ceiling above the restaurant area. Respondents inspected the bathroom ceilings and found rusted closed-loop pipe and deteriorated Armaflex insulation.

A compressor failure in the boiler room led to the examination of the closed-loop pipes in that area, including filler pipe that showed signs of rusting from the inside and outside.

The second floor ceiling was stained and moist. The ceiling was torn out because there were no access panels and it could be seen that the insulation was brittle and had been split open and the pipes rusted. There was also evidence of water staining and moisture on the first floor ceiling.

Bassin observed water staining on the access tiles of the ceiling in the Phillips Meeting Room in the basement. This area was inspected and it was discovered that the refrigerant lines had deteriorated and were brittle and cracked.

Bassin discovered evidence of prior access and repairs to the closed-loop system and devices for catching leaking water, including a milk carton placed in the lobby ceiling, a cookie sheet in the men's public bathroom, and a bucket with an attached spigot below the ceiling in the bar along side a column in front of the bar.

Bassin hired Schillinger Insulating Contractors to do insulation repair work. Schillinger and his crew removed and replaced about 100 feet of Rubatex or Armaflex insulation from the ceiling of the lobby area where the desk clerk sat. They also installed new ductwork and insulation in the stairwell area leading to the swimming pool. Schillinger and his crew removed and replaced insulation on the closed-loop pipe system in the men's public restroom in the basement area. They replaced closed-loop insulation in the Phillips Room and the adjoining room. They replaced the dried out brittle Rubatex insulation in the ceiling area above the bar. Schillinger also examined the insulation above the restaurant ceiling and found that the Rubatex or Armaflex insulation was dry. He did not repair this area because it would have required taking down the entire ceiling to insulate properly. Mr. Schillinger also examined some risers and found cracked and dried out Armaflex insulation. He stated that a wall would have to be removed to gain access to the risers in order to reinsulate them. Mr. Schillinger also examined some bathroom ceilings and found dried out and cracked open Armaflex insulation.

Bassin then employed Howard Jacobsmeyer to replace Armaflex insulation. Jacobsmeyer removed and replaced insulation on branches of the main pipe line into 6 to 10 bathrooms. He found that the Armaflex insulation was brittle and the pipes underneath rusted. He also worked on the corridor ceiling on the first floor where he found brittle insulation and rusted pipe underneath. He estimated that about 75% of the hangers were rusted. He worked several months to complete the 250 feet area on the first floor.

Respondents produced evidence supporting their contention that appellant Boulevard had notice of the problems with the closed-loop system during the time they operated the hotel. In the mid–1970's Boulevard employed Jack Leverish, a plumber, to check the condition of a bathroom ceiling. He found that the Armaflex insulation was brittle and the closed-loop pipe was rusted. He replaced the pipe in the bathroom ceiling. He did the same work in two other bathroom ceilings on two later occasions. Leverish found the closed-loop pipe in the boiler room in the same condition as the pipe in the bathroom. Cecil Lillibridge accompanied Leverish during his work at the hotel.

Joseph Babcock is a plumber who did work on two separate bathroom ceilings on two separate occasions at the hotel some time between 1975 and 1980 when the hotel was owned by Boulevard. The insulation on the pipes in the bathrooms was hard and brittle. He removed the insulation and the closed-loop pipes that were accessible, and replaced the pipes.

Allen Broddon, who had been in the heating and air conditioning business since 1955, testified that in 1975 he inspected the

heating and air-conditioning duct work above the ceiling in the bar at the hotel restaurant area. He went there with Bob Rosenthal, of Shulman Brothers Construction Company. He found the ceiling was water marked and stained. He examined the duct work and discovered that it was not insulated. Broddon advised Mr. Rosenthal that an insulation contractor should be contacted.

Broddon also examined the roof to determine whether the water on the ceiling was caused by a roof leak. Broddon's opinion was that the water was coming from the ducts.

Robert Rosenthal worked on the ceiling of the hotel in 1980, accompanied by Cecil Lillibridge. After Rosenthal removed the ceiling, Lillibridge attempted to repair a pipe line to stop the leaks.

Taso Terso, manager of the hotel restaurant from October 1979 to August 31, 1983, testified to ceiling leaks he had observed during the period from October 1979 to February 1981. He complained to several of the hotel managers concerning leaks in the bar and restaurant. He noticed leaks in the ceiling above the bar area, in an area between the cashier and the wall above the middle of the cafeteria, and above where the meat carver worked and over the tray sliding line. Terso stated that the leaks occurred primarily during the cooling season when the air-conditioning was on.

He remembered employees placing buckets or pans in different areas of the restaurant to catch the dripping water. Terso complained to Lillibridge about the leaks and Lillibridge assured Terso that he would take care of them. Terso recalled Lillibridge's placing a bucket up in the ceiling to collect the water.

Terso also testified that the managers of the hotel ate in the restaurant, even when the buckets were in place to catch the dripping water. Terso recalled seeing Probstein in the restaurant about two times when the ceiling was leaking. Terso also wrote a note to Probstein concerning the water leak but never received a response.

John Manion, an assistant manager of the hotel restaurant from 1978–79 testified that he observed leaks in the bar area, behind the cashier and in the carriage room during the summer. Manion recalled seeing Probstein in the restaurant when the buckets were being used to catch water. Manion spoke with the hotel's manager, Dennis Ansbro, about the leaks in the restaurant. Ansbro told Manion that the leaks had something to do with the air-conditioning unit. Manion also spoke with Lillibridge concerning the leaks.

Cecil Lillibridge was employed by Boulevard as head of maintenance at the hotel from 1975 until the sale of the hotel to respondents after which he continued to work at the hotel in the same capacity for the new owners. Lillibridge had employees working under him. He was in charge of the air-conditioning and heating system which included taking care of 1) leaks; 2) replacement of insulation; 3) replacement of short section of pipe; and 4) general maintenance.

Lillibridge testified that he explained the insulation and pipe problems to the general managers of the hotel. He stated that he told the comptroller, Mr. Bonacorsi, that the water running through the pipes needed to be chemically treated to prevent further damage to the pipes.

Lillibridge saw hard and brittle Armaflex insulation in the bathroom ceilings and confirmed the presence of various devices used to catch dripping water at several locations in the hotel.

In 1979, Lillibridge asked Glyn Strong, a heating and air-conditioning contractor, to come to the hotel to check out the hotel water problem. Lillibridge assisted John Mitchum in replacing deteriorated insulation in the ceilings above the guest bathrooms and above the Phillips conference room. He saw prior repair work to the pipes which consisted of duct tape wrapped over Armaflex. Lillibridge also discussed the insulation problem on the third floor with Gerald Ramsey, who was director of operations for Madesco, and as such was responsible for the operation of the Bel Air West.

After respondents took possession of the hotel, they redecorated one prototype guest room, the public restrooms and stairwells. When respondents noticed dripping water in the lobby, they employed Schillinger to do insulation work. Bassin and Loomstein became aware of the closed-loop pipe problem in the lobby, the men's public restroom and the restaurant area. In August 1981, Bassin told Loomstein that water had appeared on the third floor ceiling. Water was discovered dripping from the closed-loop system on all three floors and the devices to catch water were discovered. Loomstein advised Bassin to stop redecorating the hotel until the water problem was solved because the redecorating would be damaged by the leaks.

Appellant's evidence concerning the knowledge of, or notice to Boulevard, of a defect in the heating and air conditioning system was in conflict with that of respondent. Norman Probstein, the president of Boulevard, said he was never notified by Cecil Lillibridge of any problems of maintenance and repair. He didn't recall any problems with broken or rusted pipes prior to July 1981, and no one informed him before that time of any problem with the closed loop system. Probstein testified that no one had as much knowledge of the closed loop system as Cecil Lillibridge. Probstein had no opinion about the condition of the pipe insulation.

Various other management employees of Madesco testified they were not aware of any problems with the closed loop system. Raymond Badock, who later became president of Madesco, said there was no trouble with the closed loop system but that he remembered piping being replaced and plumbing bills.

There was testimony that Lillibridge was in charge of maintenance but had limited authority either to hire and fire or to pay bills.

David Sidney testified as an expert in appellants' case. He examined the heating and air conditioning system at the Bel Air West. He said that it was not unusual to find leaking pipes in a 20–year old installation, but said on cross examination that

properly installed insulation should last for the life of the building.

On September 17, 1981, Loomstein sent a letter to Boulevard. Loomstein alleged in the letter that Boulevard had knowledge of the defect in the closed-loop system and that Boulevard had materially breached the written warranty in § 8.4 of the sales agreement. Loomstein did not receive a written response to this letter, although Boulevard's counsel, Portman, spoke with respondent's counsel, Compton, about it.

In October 1981, Bassin observed internal rusting on closed-loop pipe in the boiler room. Loomstein asked Bassin to find out the cost of repairing the closed-loop system. Dan Heely, a mechanical contractor, examined the closed-loop system and estimated that it would cost $242,000.00 for the installation of new mains and runouts. In conjunction with the Heely estimate, Bassin prepared a $224,000.00 estimate on behalf of Allcrafts Corporation, a general contracting company in which Bassin and Loomstein were officers and shareholders, for the demolition of walls and ceilings, removal of existing closed-loop pipe and replacement of walls and ceilings. On December 24, 1981, Loomstein sent a letter to Boulevard advising them once again of the condition of the closed-loop pipes. Enclosed with this letter were the Allcrafts and Heely estimates. Respondents received no written response to the letter.

As of December 24, 1981, it was still Loomstein's intention to continue to operate the hotel and pay the principal installment due in January 1982.

Boulevard's lawyer, Portman, contacted respondents' attorney, Compton to discuss the letter and to request that he be provided with copies of the enclosures in the letter. After reviewing these materials, Portman denied that anything was wrong with the hotel. Boulevard refused to repair or replace the alleged defect in the closed-loop system.

After discovering the cost of repairing the closed-loop system, respondents found that they could not refinance the balance due on the hotel for the amount required to pay the $400,000.00 principal payment due

in January 1982 plus the additional repairs to the closed-loop system. According to respondents, the estimates to repair the system exceeded $500,000.00.

Respondents unsuccessfully sought a wrap around mortgage from Jeffrey Wolfert, whose firm, Hotel Investment Group, secures loans and mortgages for hotels.

Respondents borrowed additional money to operate the hotel. Respondents also incurred interest expenses on these bank loans. Respondents incurred expenses for monthly lease payments for Thermasal steam units and telephones located in guest rooms, and for attorney's fees and other professional expenses. On November 26, 1981, there was a fire in Room 139 of the hotel and respondents received a check for $12,298.20 from the insurance company. The check was not cashed prior to trial.

On January 30, 1982, Boulevard's attorney, Portman, mailed a notice to respondents that their failure to pay the principal installment within ten days would constitute an "event of default". There were telephone conversations between the attorneys for the parties in the ten days prior to the due date of the $400,000 payment, not about the closed loop system but about how payment might be made. Respondents did not pay the principal installment within the ten day period.

On February 9, 1982, respondents sued Boulevard for fraud concerning misrepresentation of Boulevard's notice of the defect in the heating and cooling system. Respondents further alleged that the purchase note was not in default because Boulevard's breach of warranty in the contract terminated respondents' duty to perform under the contract.

Portman prepared and had delivered to respondents a notice of foreclosure. The foreclosure sale took place on March 12, 1982, at which Boulevard purchased the leasehold estate in the hotel for $100,000.00. Respondents voluntarily relinquished possession of the hotel.

On April 29, 1983, Boulevard sold the hotel to Bar-Val Company and took back two deeds of trust.

This case was tried without a jury in the Circuit Court of the City of St. Louis for eighteen days during the period of April 23, 1984, to July 24, 1984.

The trial court entered its judgment on January 25, 1985, finding in favor of respondents and against appellant Boulevard on Count II for constructive fraud and on Count IV for breach of contract. The trial court rescinded the hotel sales agreement and entered judgment for damages against Boulevard totalling $445,830.00. Judgment on Count V was in favor of respondents and against appellant Boulevard in the amount of $7,489.00 for damages for certain property. This amount was included in the $445,830.00. The trial court allowed appellants an offset against respondents' damages in the sum of $36,348.00.

Judgment was in favor of respondents and against defendant Madesco on Count VI in the sum of $229,720.00 because Boulevard had transferred to Madesco the $200,000 paid at the closing plus the interest payments made by respondents, the judgment to be satisfied if the judgment against Boulevard were paid and satisfied.

The court entered judgment in favor of Probstein and defendant Boulevard on respondents' claim for actual fraud. The court also entered judgment in favor of Probstein and defendant Boulevard on respondents' claim for wrongful foreclosure. Judgment was in favor of respondents and against appellant Boulevard on all six counts of appellants' counterclaim. It is from these judgments that Boulevard and Madesco appeal.

Appellants allege in their first point on appeal that the trial court erred in entering judgment in respondents' favor on Count II for constructive fraud and Count IV for breach of contract, because there was no substantial evidence to support the court's conclusion that appellant Boulevard had actual notice of a substantial defect in the heating, air-conditioning and plumbing systems of the hotel. Appellants include four separate allegations of error with respect to the lack of substantial evidence claim. After consideration of each allegation of error, this court finds that the trial court's

decision was supported by substantial evidence and therefore point I is denied.

Appellants charge that no individual officer or employee whose knowledge properly could be imputed to appellant Boulevard under the law had actual knowledge of a defect as the term is used in § 8.4 of the sales agreement.

Respondents offered the testimony of Cecil Lillibridge, the maintenance supervisor, to support their claim that Lillibridge's notice of the defect in the heating and air-conditioning and plumbing systems constituted notice to appellant Boulevard, Lillibridge's corporate employer. Appellants argued that only the knowledge of general managers of the hotel or others ranking above the managers in the corporate chain could be considered.

The knowledge of an agent of a corporation regarding matters within the agent's scope of employment and authority and to which his employment or authority extends is imputed to the corporate principal. *Packard Manufacturing Co. v. Indiana Lumbermens Mutual Insurance Co.*, 356 Mo. 687, 203 S.W.2d 415, 421 [7, 8] (Mo. banc 1947); *Eveready Heating and Sheet Metal, Inc., v. D.H. Overmyer, Inc.*, 476 S.W.2d 153, 155 [4] (Mo.App.1972). A corporation is charged with the knowledge of its officers and agents even if the officers or agents do not communicate the knowledge. *Medicine Shoppe International, Inc. v. J-Pral Corp.*, 662 S.W.2d 263, 270 [7] (Mo.App.1983).

Lillibridge acted as the head of Boulevard's maintenance department from April 1975 until Boulevard sold the hotel in July 1981. Lillibridge maintained the air conditioning and heating systems, supervised work on the closed-loop system and performed repair work on the same system. He acquired his knowledge of the condition of the heating and air-conditioning and plumbing systems through his daily work at the hotel, clearly within the scope of his employment and authority. The fact that he reported to superiors on maintenance matters does not lessen the importance of his position to that of a mere ministerial employee. Lillibridge's notice

therefore properly could be imputed to appellant Boulevard.

Appellants rely on a line of case authorities which state that knowledge of a ministerial servant, as distinguished from knowledge of an employee having general powers or authority such as a manager or general agent, cannot be imputed to the employer. *C.I.T. Corporation v. Byrnes*, 38 S.W.2d 750, 752 (Mo.App.1931); *Varas v. James Stewart & Co.*, 223 Mo.App. 385, 17 S.W.2d 651, 655 (1929); *King v. Rowlett*, 120 Mo.App. 120, 96 S.W. 493, 494 (1906).

Respondents correctly distinguish the cases cited by appellants by asserting that Lillibridge, as maintenance supervisor, was more than a mere "ministerial" employee and that the cases cited by appellants all concerned "ministerial" employees. Lillibridge was head of maintenance. He hired and discharged employees and purchased supplies required for the day to day maintenance of the hotel. In addition to his responsibility for the heating and air conditioning system he was also in charge of the electrical and plumbing systems. Lillibridge's position and responsibilities were such that his knowledge properly may have been imputed to appellants. *Hotchner v. Liebowits*, 341 S.W.2d 319, 327 (Mo.App. 1960); *Maybee v. Missouri Orpheum Corp.*, 238 Mo.App. 537, 181 S.W.2d 771, 774 [4] (1944).

Appellants also charge that the trial court erroneously admitted into evidence, over hearsay objections, statements made by seven witnesses who testified concerning what Cecil Lillibridge had previously said to them. Four of these statements were made to four different witnesses while Lillibridge worked for appellant Boulevard and three of the statements were made to three different witnesses while Lillibridge worked for respondents. In addition to these seven statements, appellants claim error in the admission of notes taken by an inspector of the hotel during his inspection which contained comments made by Lillibridge and the admission into evidence of Lillibridge's unsigned statement taken by respondents' attorney in February of 1982.

All of the Lillibridge statements related to the condition of the hotel's heating, air-conditioning, and plumbing systems prior to the sale of the hotel to respondents. Respondents argue that the statements were not offered to prove the truth of the matters asserted therein, but to prove appellant Boulevard's knowledge of the defect and therefore were not hearsay.

Respondents rely on a line of cases which hold that the existence or absence of knowledge may be shown by declarations of the person whose knowledge is of importance, even though such statements were made a considerable time before or after the time in inquiry, provided there is not such an element of remoteness as destroys materiality. *Wainwright v. Westborough Country Club*, 45 S.W.2d 86, 91 (Mo.App. 1932). *See State ex rel. S.S. Kresge Co. v. Shain*, 340 Mo. 145, 101 S.W.2d 14, 16 (1936).

Appellants, however, relying on *Jordan v. Robert Half Personnel Agencies of Kansas City, Inc.*, 615 S.W.2d 574 (Mo. App.1981), assert that if the declarant's utterances are reported for the purpose of showing his prior knowledge, their use is clearly hearsay and they can only be admitted into evidence under some exception to the hearsay rule. *Id.* at 584.

In *Jordan*, the Missouri Court of Appeals, Western District, questioned the validity of the *Wainwright* line of cases, including *Shain*, decided by the Missouri Supreme Court. This court finds no reason to choose among apparently conflicting case law on these facts as substantial evidence exists in the record to support the trial court's decision without the introduction of any of the seven witness statements.

Applying the *Jordan* rule to the facts in this case may indeed render the statements made by the three witnesses who spoke with Lillibridge after the sale of the hotel to respondents hearsay because the statements related to Lillibridge's prior knowledge of the condition of the hotel. The same rationale applies to Lillibridge's statement to respondents' attorney while he was employed by respondents. However, even if these three statements were erroneously admitted into evidence over hearsay objections, four witnesses testified concerning statements made by Lillibridge to them prior to the sale of the hotel indicating Lillibridge's knowledge of the hotel's condition at that time.

Appellants argue that the four statements made prior to the sale of the hotel violate the *Jordan* rule because Lillibridge made these statements in the context of reporting his prior state of mind. This court finds this argument unpersuasive as the record reflects that several of the witnesses testified concerning statements made by Lillibridge indicating notice at the time spoken.

▮ The admission of evidence alleged to be hearsay is reversible error only if the complaining party is prejudiced by its inclusion. *Conoyer v. Conoyer*, 695 S.W.2d 480, 482 [1–4] (Mo.App.1985). The complaining party is not prejudiced by the allegedly inadmissible evidence if the evidence is merely cumulative to other related admitted evidence. *Id.* Additionally, in a court tried case such as this one, it is practically impossible to base reversible error on the erroneous admission of evidence. *Id.*

▮ Even if this court should accept appellants' argument that all seven witnesses' testimony concerning statements made by Lillibridge were inadmissible, the record is replete with additional evidence that appellant Boulevard had actual notice of a substantial defect in the heating, air-conditioning and plumbing systems of the hotel. This evidence includes: Lillibridge's own testimony, testimony from plumbing contractors who had worked on the hotel's closed-loop system prior to the sale to respondents, circumstantial evidence discovered which indicated the closed-loop system had been worked on, and devices and receptacles concealed in strategic locations to catch dripping water which were discovered by respondents' employees. As there is other sufficient, competent evidence to support the trial court judgment, even an erroneous admission of all seven witnesses' testimony would not mandate reversal here.

*Matter of Estate of Dowdy,* 680 S.W.2d 362, 363 [2, 3] (Mo.App.1984).

Having already determined that Lillibridge's notice of the defect could be imputed to appellant Boulevard, this court finds that substantial evidence exists in the record to support the trial court's decision.

Appellants allege the trial court erred in admitting testimony and exhibits concerning the condition of the hotel after respondents relinquished its possession because the evidence was irrelevant and immaterial.

Appellants objected to the introduction of the testimony of Caesar Garavaglia, a maintenance man at the hotel from August 1983, until March 1984, after appellant Boulevard had resold the hotel. They also objected to the introduction of a series of photographs taken by respondents during an inspection of the hotel in January 1983. Appellants argue that this evidence is not relevant to the condition of the heating and air-conditioning systems of the hotel during the relevant time period before the sale of the hotel.

■ The trial court's decision on the admissibility of evidence is to be accorded great weight and will not be disturbed unless shown to be an abuse of discretion. *Roque v. Kaw Transport Co.,* 697 S.W.2d 254, 256 [1] (Mo.App.1985).

■ Garavaglia's testimony related to the condition of the closed loop pipe he observed in 1983–1984. The photographs complained of were taken in January 1983 and depicted various pipes throughout the hotel and the splitting or cracked insulation on the pipes. This court finds no abuse of discretion on the part of the trial court in admitting this evidence as it may very well have been probative and relevant to the condition of the pipes during the time before the sale of the hotel to respondents because of the progressive nature of the claimed defects.

Appellant further claims that the court's decision that there was a substantial defect in the condition of the hotel's systems was clearly erroneous based on the dictionary definitions of the terms "substantial" and "defect". Appellant claims it had no actual notice of any substantial defect and had no more than knowledge of mere deterioration caused by the age of the building and its systems. Appellant fails to recognize that it need not have had actual knowledge of the defects, but instead need only have had actual notice of the defects. Lillibridge's knowledge of the defects could be imputed notice of the defects to appellant Boulevard. The trial court's decision that the defects were substantial is addressed in discussion of point V. Point I is denied.

■ Appellants assert in point II that the trial court erred in entering judgment in respondents' favor on Count II and Count IV because it was against the weight of the evidence to find that there was a substantial defect in the heating and air conditioning system of the hotel. They argue that the court improperly excluded evidence proffered by appellants and that either the competent evidence established there was no substantial defect or that they, appellants, did not have actual notice of a substantial defect. Appellate courts are admonished to set aside a judgment in a court-tried case on the ground that it is against the weight of the evidence only with caution and a firm belief that the judgment is wrong. *Murphy v. Carron,* 536 S.W.2d 30, 32 [1–2] (Mo. banc 1976). This court does not have the requisite belief that the judgment of the trial court here was wrong. The point is denied.

In their third point relied on, appellants allege that the trial court erred by misapplying the law in concluding that plaintiffs had a right to rely on § 8.4 of the sales contract because plaintiffs independently investigated and inspected the hotel. This court finds no error.

"The sales contract prepared by appellants included:

Section 8.4 Seller has no actual notice of any substantial defect in the structure of the hotel or in any of its plumbing, heating, air-conditioning, electrical, or utility systems.

Section 15.1 All representations and warranties set forth in this Agreement shall survive the closing and thereafter shall be fully effective and enforceable,

and shall not be affected by any investigation, verification, or approval by any party or anyone on behalf of such party."

The trial court found that respondents had the right to, and did in fact, rely on the representations and warranties made by appellant in the sales contract. This finding will not be disturbed unless it is against the weight of the evidence, is not supported by substantial evidence or, as appellant suggests, is a misapplication of the law. *Murphy v. Carron*, 530 S.W.2d 30, 32 [1–3] (Mo. banc 1976).

Appellants argue that respondents did not have a right to rely on the representations in the sales contract because respondents independently investigated and inspected the hotel for defects. Appellant maintains its position that the sale of the hotel was on an "as is" basis despite the express warranty language in the sales contract.

■■■■■ The fact that one makes an independent investigation does not necessarily show that he relies on the information gained from the investigation rather than the representations made by the other party. 37 Am.Jur.2d *Fraud and Deceit* § 230 (1968). In addition, if the one making the investigation makes only a partial investigation and relies on the misrepresentations as well as the investigation he may maintain an action for fraud. *Id.* at § 238.

These general principles of law are supported by Missouri case law. In *Morrill v. Becton, Dickinson and Co.*, 747 F.2d 1217, (8th Cir.1984), the eighth circuit, applying Missouri law, held that the opportunity for investigation does not bar the right of reliance in a fraud action. *Id.* at 1223–24 [9]. The eighth circuit relied on *Tietjens v. General Motors Corp.*, 418 S.W.2d 75 (Mo. 1967). In *Tietjens*, the plaintiff-buyer alleged fraud on the part of defendant-seller in the sale of real estate business equipment. The court restated the general rule that notice and means of knowledge have no application "where distinct and positive representations of fact have been made." *Id.* at 82. *See also Mahaffey v. Kwon*, 659 S.W.2d 562, 564 [1] (Mo.App.1983).

■■■■ When distinct and specific representations have been made and are to be acted upon, the representee has the right to rely on the representation even if the parties stand on equal footing or have equal knowledge or means of information relating to the subject matter of the representation. *Essex v. Getty Oil Co.*, 661 S.W.2d 544, 550 [5–7] (Mo.App.1983); *Universal C.I.T. Credit Corp. v. Tatro*, 416 S.W.2d 696, 703 [16–20] (Mo.App.1967). Likewise, the representee is entitled to rely on the representation when he lacks equal footing for learning the truth and where the facts are peculiarly within the knowledge of the party making the representation and are difficult for the representee to ascertain. *Essex*, 661 S.W.2d at 550 [5–7].

■■■■ Moreover, the general rule relating to the diligence required of one with inferior knowledge or standing who undertakes an investigation is that "[t]he law does not require extraordinary diligence, and does not ask that a representee be unduly incredulous and skeptical, resort to extremes of precaution, or exhaust all possible sources and means of investigation ..." 37 Am.Jur.2d *Fraud and Deceit*, at § 253.

Appellants made distinct warranties concerning the heating and air-conditioning systems. Respondents made their own investigation but were not estopped from relying on the specific warranty language contained in § 8.4 of the sales contract. Respondents did not stand on equal footing with appellants with respect to determining the condition of the hotel in a 21–day period where appellants had been in control of the building since its construction, over 20 years previously.

Although respondents' inspectors were allowed unlimited access to the hotel and its systems, there were many areas that could not be inspected without incurring substantial costs for tearing out walls or removing ceilings. In addition, respondents offered evidence that appellants' then employee, Cecil Lillibridge, offered explanations to Bassin, respondents' inspector, for many of the problems he did encounter during his inspection. According

to Bassin, Lillibridge told him that many of the stains on bathroom ceilings on the third floor were caused by a roof leak. He also told Bassin that many of the stains on the third floor corridor were caused by a roof leak. Lillibridge told Bassin that other stains in the ceilings were caused by overflowing toilets and bathtubs. In addition, all of respondents' inspections took place in April 1981 when the air-conditioning system was not in operation.

The mere presence of opportunities for investigation will not of itself preclude the right of reliance. *Meyer v. Brown*, 312 S.W.2d 158, 161 (Mo.App.1958).

Appellants rely on the general rule on actual reliance as set forth by the court in *Consumers Cooperative Association v. McMahan*, 393 S.W.2d 552, 556 (Mo.1965):

> Where the parties are on equal footing and the means of knowledge is equally available to both parties, a misrepresentation or erroneous statement of fact is not actionable. (citations omitted) Furthermore, where a party makes his own independent investigation, he will be presumed to have been guided by what he learned and the conclusions he reached and will not be permitted to say that he relied on misrepresentations of another and that he was deceived thereby.

*Id.* at 556 [5–6].

In *Consumers Cooperative*, the plaintiffs brought a negligence action for damages for its baling wire stored by defendant pursuant to an oral contract. Plaintiffs argued that they relied on defendant's oral statements that the wire would be protected in the underground mined-out quarry. Plaintiff's agents inspected the quarry, knew there was no heat in the quarry and no mechanical means of controlling humidity. *Id.* at 555. The court ruled that defendant's representation was no more than an expression of opinion and therefore not actionable. *Id.* at 556 [4].

The rule espoused in *Consumers Cooperative* is not applicable to the facts in the present case because appellants and respondents here did not stand on equal footing. In addition, appellants here made distinct and specific representations in § 8.4 of the sales contract. They also agreed in § 15.1 that all representations and warranties would survive the closing and would not be affected by any investigation. *See Tietjens*, 418 S.W.2d at 82. The point is denied.

Appellants allege as error in point IV that the trial court misapplied the law because: 1) Count VI of respondents' petition which sought imposition of a constructive trust incorporated by reference only the allegations of actual fraud in Count I on which the trial court ruled against respondents; and 2) the judgment in respondents' favor on Count II for constructive fraud was erroneous. Point IV is also denied.

The trial court found in favor of respondents on Count II for constructive fraud and imposed a constructive trust against Madesco because appellant Boulevard had transferred the principal and interest payments made by respondents to Madesco. Because the court found constructive fraud, this imposition of a constructive trust was proper.

Constructive trusts are based upon fraud, actual or constructive. *Thomason v. Beery*, 361 Mo. 424, 235 S.W.2d 308, 311–12 (1950). Courts use a constructive trust to provide a remedy in cases of actual or constructive fraud or unjust enrichment. *U.S. Fidelity and Guaranty Co v. Hiles*, 670 S.W.2d 134, 137 [5–10] (Mo.App.1984).

Appellants argue that respondents' pleading in Count VI incorporated by reference only the allegations of actual fraud found in Count I, which was decided against respondents, and not those allegations of constructive fraud found in Count II. Respondents' failure to incorporate by reference the allegations of constructive fraud in its claim for a constructive trust does not make the court's imposition of the constructive trust erroneous.

The Supreme Court of Missouri addresses the issue as follows:

> When issues not raised by the pleadings are tried by express or implied consent of the parties, they shall be treated in all respects as if they had been raised in the

pleadings. Such amendment of the pleadings as may be necessary to cause them to conform to the evidence and to raise these issues may be made upon motion of any party at any time, even after judgment; *but failure so to amend does not affect the result of the trial of these issues.*

Rule 55.33(b) (emphasis added). See also *Pike v. Pike,* 609 S.W.2d 397, 400 [1, 2] (Mo.banc 1980), where the court states that when variance occurs without objection between pleading and proof, such variance, especially in court-tried cases, shall be considered immaterial and the pleadings deemed amended to conform to the proof.

The evidence supported the finding of constructive fraud on which to base the constructive trust. Count VI can be deemed amended to include incorporating by reference the allegations in Count II for constructive trust. In addition, respondents included in Count II a prayer for "further orders and judgments as the court shall deem just and proper". Therefore, the court's imposition of a constructive trust could be based on the general prayer for relief in Count II.

Appellants fail to cite, nor is this court able to find in the record any objection to the failure of respondents to incorporate by reference Count II in Count VI. Any alleged error on this point is not of such a prejudicial nature as to warrant review for plain error. Point IV is also denied.

Appellants contend in point V that the trial court erred in granting rescission and restitution on respondents' Count II for constructive fraud and Count IV for breach of contract because the court misapplied the law in concluding: 1) that a breach of § 8.4 of the sales contract was a substantial breach going to the root of the contract and 2) that respondents did not waive their right to rescind the sales contract because they continued to perform under the sales contract. The point is not well taken.

A party to a contract may elect to rescind upon a breach by the other party. Such a breach should be of a "vital provision going to the very substance or root of the contract." *McCullough v. Newton,* 348 S.W.2d 138, 142 [4–6] (Mo.1961).

The trial court based its decision on an analysis of the Restatement of Contracts § 275 found in *B & B Equipment Co., Inc. v. Bowen,* 581 S.W.2d 80, 86–7 (Mo.App. 1979). In *B & B Equipment,* the court analyzed the factors set forth in § 275 of the Restatement of Contracts in determining whether to rescind a stock purchase agreement and contract for services. In the present case, the trial court utilized the same restatement analysis including the following factors:

1. The extent to which the injured party will obtain a substantial benefit which he could have reasonably anticipated.

2. The extent to which the injured party may be adequately compensated in damages for lack of complete performance.

3. The extent to which the party failing to perform has already partly performed or made preparations for performance.

4. The greater or less hardship on the party failing to perform in terminating the contract.

5. The willful, negligent, or innocent behavior of the party failing to perform.

6. The greater or less uncertainty that that party failing to perform will perform the remainder of the contract.

The court here found with respect to these factors that: 1) respondents would be unable to retain the substantial benefit of the contract which they reasonably anticipated because respondents' expectation when entering the contract was to operate a hotel without a defective heating and air-conditioning system; 2) respondents would not be adequately compensated in damages for lack of complete performance because respondents no longer own the hotel and it would have been unreasonable for respondents to have continued paying on the lease and notes after appellants' failure to perform; 3) appellants' part performance was defective; 4) there is no greater or less hardship on appellant Boulevard, the party failing to perform, in terminating the contract because in effect, the contract had already been abandoned and appellant Boulevard had re-sold the proper-

ty; 5) the party failing to perform, appellant Boulevard, acted willfully and negligently by failing in good faith to attempt to remedy the defects; and 6) there is. no uncertainty that Boulevard, the party failing to perform, will perform the remainder of the contract because it is no longer in a position to complete performance as the building has been resold.

■ The trial court did not misapply the law in its analysis of this issue. Although the cost estimates, and perhaps even the necessity of replacing the closed-loop system, were disputed, the trial court did not err in determining that the necessity of repairing or replacing the closed-loop system was a substantial breach going to the root of the contract. The parties bargained for the inclusion of § 8.4 in the sales agreement and there was substantial evidence to support a finding that a breach of this section was a material breach.

■ Appellants also contend that the trial court erred in not finding that respondents had waived their right to elect to rescind the sales contract. An election to rescind a contract must be made promptly. The offer to rescind is timely if made in time to insure that the non-rescinding party is put in the status quo prior to entering the contract. *Quigley v. Bartlett,* 260 S.W. 494, 497 [5–8] (Mo.App.1924).

The trial court ruled that the election to rescind was timely. The court emphasized the fact that respondents notified appellants on two occasions (letters of September 17 and December 24, 1981). The court noted that even after receiving notice, appellants made no attempt to remedy the defects in the heating and air-conditioning system, and in fact foreclosed on the hotel and subsequently resold it.

Appellants argue that respondents continued to pay their monthly interest payments on the notes even after the September 17, 1981 letter and that this action was inconsistent with the election to rescind the contract.

Respondents replied, and the trial court concurred, that they did not stand by in silence and attempt to take advantage of the contract once the defects were noticed. Respondents notified appellants in September of 1981 soon after the problem was first suspected. With little, if any, response from appellants, respondents continued to investigate the closed loop system to determine the extent of the problem.

It was not until November or December of 1981 that respondents knew the full extent of the problem through cost estimates for replacement of the system. Respondents notified appellants again by a letter dated December 24, 1981. Respondents continued to pay the monthly interest installments expecting that appellants would remedy the discovered heating and air-conditioning and plumbing problems. When the principal payment came due in January of 1982, respondents, still having received no affirmative response to the problems addressed in the two letters, declined to pay the principal payment which allowed appellants to foreclose.

■ In deciding the question whether respondents' decision to rescind was timely the court must consider whether appellants have been placed in a disadvantaged position by the delay. *Cannon v. Bingman,* 354 S.W.2d 894, 906 (Mo.App.1962). *See also MacCurrach v. Anderson,* 678 S.W.2d 459, 463 [12, 13] (Mo.App.1984).

■ Appellants were not disadvantaged by the delay in respondents' action for rescission of the contract. Appellants received and retained the benefits of the contract. Appellants took possession of the hotel upon respondents' default and resold it.

■ Appellants also complain that the trial court's exclusion of certain evidence concerning respondents' waiver of their right to rescind made the court's decision against the weight of the evidence. Reversible error based on the rejection of evidence is not an issue on appeal in any court-tried case. *See City of Town & Country v. St. Louis County,* 657 S.W.2d 598, 608 [15–17] (Mo.banc 1983).

■ In addition, appellants claim that respondents' election seeking rescission of the sales contract was not time-

ly because respondents failed to seek rescission until they filed their second amended petition in November, 1982. The prayer of the petition may be disregarded in determining what relief is authorized by the facts pleaded (cite omitted). *Mills v. Keith Marsh Chevrolet, Inc.*, 549 S.W.2d 604, 608 [5–7] (Mo.App.1977). A plaintiff is authorized to make an election at the time the cause is submitted. *Id.* Point V is denied.

In point VI, appellants charge the trial court with error in awarding restitution in the amount of $445,830.00 on Counts II and IV because it misapplied the law: 1) in permitting recovery for certain improvements, repairs, labor costs, and lease payments; 2) in refusing to permit appellant Boulevard to discover respondents' individual tax returns; and 3) in improperly admitting into evidence testimony and exhibits which lacked foundation, without which insufficient evidence existed to support a restitution award in excess of respondents' payments to appellant Boulevard under the sales contract. There was no error.

Appellants contend that restitution is not recoverable under the law for the cost of improvements, repairs, labor costs, and lease payments. The trial court awarded $18,725.51 for improvements. Appellants complain that approximately $5,300 worth of improvements were made after September 1, 1981, the time respondents knew of the alleged fraud and breach of contract. Appellants argue that respondents had a duty to minimize the damages after obtaining knowledge of the alleged breach of the sales agreement.

Appellants necessarily assume that as of September 1, 1981, respondents knew the full extent of the closed-loop defect and knew that appellants were not going to take measures to correct the defect. The facts do not support this assumption. Respondents did not officially notify appellants of the defect until September 17, 1981.

There is no indication that respondents considered the sales contract breached as of September 1, 1981. Respondents produced evidence that they were waiting to see if appellants would repair the defects.

Respondents did cease making improvements by September 17, 1981, the date the letter was sent to appellants. Additionally, respondents' improvements had been started prior to their discovery of the defects. To have abandoned some of them on September 1 could have caused greater expense to appellants than continuation of the expenditures already committed.

Appellants complain that the trial court's award of $6,384.26 for labor costs associated with making improvements to the hotel was erroneous. Appellants argue that intangible labor costs do not increase the value of the hotel. This argument fails to recognize that the improvements could not have been realized without the cost of the labor to do the actual work.

In cases of quantum meruit recovery, the breaching party of a contract is required to return to the injured party the reasonable value of work and labor furnished while the contract was sought to be performed. *Curators of Univ. of Missouri ex rel. Shell-Con, Inc. v. Nebraska Prestressed Concrete Co.*, 526 S.W.2d 903 (Mo. App.1975). The same holds true in a case such as this where the trial court attempts to fashion an equitable remedy placing respondents in the position they were in before entering the contract. The labor costs associated with the improvements were correctly characterized by the trial court as actual damages.

Appellants argue further that the court's award of $65,918.93 as restitution to respondents for repairs was erroneous as expenses of general maintenance and upkeep were necessary to maintain the premises.

Appellants rely on *In Matter of Hummel*, 23 B.R. 8, 13 (W.D.Mo.1982), *rev'd on other grounds* in an unpublished opinion which states that general maintenance and upkeep expenses are not recoverable because they come within a party's duty to restore the other party to the status quo.

Respondents allege that the $65,918.93 figure represents the money respondents spent in repairing the defective closed loop pipe system. Respondents did

not consider this ordinary maintenance, and finally discontinued the repairs when they received estimates for repair and replacement of the system for over $500,000.00. Appellants received the benefit of this repair work upon resuming possession of the hotel. The trial court ruled that the repair costs were actual damages suffered by respondents and this court finds no misapplication of the law in its conclusion.

Appellants further allege the trial court erred in awarding restitution of $17,787.14 to respondents for telephones and thermosal steam units leased by appellants prior to the sale of the hotel to respondents. Appellants argue respondents are not entitled to damages because respondents and their hotel guests derived benefits from the payments. Respondents, on the other hand, point out that had they not kept up the lease payments, the telephone and thermosal units would have been removed from the hotel and appellants would have had to pay to have them reinstalled.

■ The trial court granted appellants an offset against respondents' damages in the sum of $2,596.00 for telephone and thermosal payments made by appellants while respondents were in possession. The trial court did not misapply the law in granting the sum of $17,787.14 as restitution to respondents.

■ Appellants claim the trial court erred in not considering tax benefits that may have accrued to respondents from their operation of the hotel. The trial court denied appellant Boulevard's request to discover complete copies of respondents' individual tax returns. The portions of respondents' individual tax returns relating to the hotel sale were produced for the specified years requested. The trial court limited the discovery of tax records to those records relating to the sale and operation of the hotel. A trial court's determination of the relevancy of a discovery request is subject to reversal only upon a showing of abuse of discretion. *Hoffmann v. Hoffmann,* 676 S.W.2d 817, 828 [17] (Mo.banc 1984).

■ Appellants contend that the complete tax returns were necessary in order to establish the actual tax benefit respondents received. The trial court, however, ruled that any tax benefit respondents may have received are not ascertainable consequences of this one business deal as all respondents were involved in several business ventures with losses and gains not relevant to this case. This court finds no abuse of the trial court's discretion in not allowing appellants to discover respondents' complete individual tax returns.

Appellants also complain that the trial court erred in admitting Phil Bassin's testimony concerning expenditures respondents made for repairs and improvements because Bassin did not have independent knowledge of payment of the various bills making his testimony insufficient to support restitution damages awarded by the court.

■ Damages need not be proved with exact certainty. *Truck Insurance Exchange v. Bill Rodekopf Motors,* 623 S.W.2d 612, 614[3] (Mo.App.1981); *Lewis v. Hubert,* 532 S.W.2d 860, 869 [19, 20] (Mo. App.1975).

■ In the present case, Bassin identified pages of bills and a list of checks written to pay the bills and a summary of the labor costs for Mr. Lillibridge, Mr. Wolf, and Mr. Jacobsmeyer. Bassin supervised the maintenance personnel and directed that the bills be paid. Bassin provided the court with estimates of time spent by Parklin and Centerco employees in repairing and improving the property. The estimates were offered as proper elements of damages as they were the best measure available. *Denton Construction Co. v. Missouri State Highway Commission,* 454 S.W.2d 44, 56 (Mo.1970). The court did not err in admitting this testimony. Point VI is denied.

Appellants in Count VII allege the trial court erred and misapplied the law in awarding respondents pre-judgment interest on Counts II (constructive fraud), IV (breach of contract), and VI (constructive trust) because: a) pre-judgment interest is not recoverable in a tort action; b) a por-

tion of the damages awarded were unliqui-dated amounts; and c) the interest awards were calculated improperly. The point is denied.

■ Appellants' contention that pre-judgment interest is not appropriate in this case because pre-judgment interest is not recoverable in tort actions is not per-suasive. Respondents sought rescission of a contract and restitution based on con-structive fraud. Prejudgment interest is appropriate in a case such as this, even if the case has elements of a tort action. *Crawford v. Smith*, 470 S.W.2d 529, 533[9] (Mo.banc 1971); *Schroeder v. Zykan*, 255 S.W.2d 105, 110[5] (Mo.App.1953).

Appellants also argue that the trial court erred in awarding pre-judgment interest on certain damages that were not liquidated and that the interest awards were calculat-ed improperly.

■ The general rule is that pre-judgment interest is not allowed if the dam-ages are unliquidated in nature. *Ohlen-dorf v. Feinstein*, 670 S.W.2d 930, 935 (Mo. App.1984). Prejudgment interest, how-ever, is allowed where the amount is readi-ly ascertainable by computation according to a recognized standard. *Id.* There was sufficient evidence to support reasonably accurate damage amounts. The trial court did not err in awarding $97,500.00 as pre-judgment interest against appellant Boule-vard.

■ Appellants' final contention is that the pre-judgment interest award was erro-neous because the trial court failed to spec-ify the items for which pre-judgment inter-est was awarded and the period of time for which it was calculated. Appellants cite no authority in support of this proposition and we find none. The trial court's lack of definiteness does not render the award er-roneous. This court has calculated an in-terest award using the dates and amounts in the record that exceeds that award given by the trial court. The trial court's award is not excessive. Appellants cannot com-plain that the award is prejudicial to them. It is less than a reasonable amount calcu-lated by this court. The trial court acted within its discretion. Point VII is denied.

In Point VIII, appellants complain that the trial court erred in awarding only $48,-640.20 as an offset to the restitution awarded respondents because the award was against the weight of the evidence. This point also has no merit.

■ A trial court's findings as to dam-ages recoverable are entitled to great weight on appeal and will not be disturbed unless it is shown that the damages award-ed were clearly wrong, could not have been reasonably determined, or were excessive. *Montrose Savings Bank v. Landers*, 675 S.W.2d 668, 672 [8] (Mo.App.1984).

This court is not willing to hold that the trial court's determination of the amount of the offset appellants are entitled to is clear-ly wrong, was not reasonably determined, or is excessive. Therefore, Point VIII is denied.

The appellants allege in point IX that the trial court erred in awarding identical resti-tution awards on both Counts II and IV of respondents' petition and by imposing a constructive trust against Madesco in an amount intended as security for the pay-ment of the judgment against appellants. They contend the court misapplied the law because the form of the judgment, as en-tered, awarded respondents double dam-ages. This point is also denied.

As appellants correctly state, "a party cannot be compensated for the same injury twice". *Ross v. Holton*, 640 S.W.2d 166, 173 (Mo.App.1982). However, respondents were not compensated twice nor is there a danger that respondents can collect more than once on the money judgment entered by the court.

■ In the judgment, the trial court awarded respondents $445,830.00 on both Counts II (constructive fraud) and IV (breach of contract) stating that the award was "pursuant to the damages as described in the general findings". In the general findings and conclusions of law, the court stated that respondents' "total damages" equaled $445,830.00. The use of the term total damages indicates that respondents

are limited to collection of only one $445,-830.00 less the offsets listed by the court.

■ The trial court also entered judgment in respondents' favor on Count IV against Madesco for constructive fraud and imposed a constructive trust against Madesco in the amount of $299,720.00. By the terms of the judgment itself, the judgment against Madesco for the $299,720.00 would be satisfied by payment of the judgment entered in respondents' favor on Counts II and IV. Therefore, the $299,720.00 does not represent additional damages, but instead acts to insure that respondents are able to recover their judgment against Boulevard, Boulevard having already transferred this $299,720.00 to Madesco.

Appellants also raise their concern that the judgment does not provide for the possibility of appellant Boulevard's making a partial payment on its judgment prior to respondents' seeking recovery from Madesco. This concern is groundless, however, because any payment on the judgment in excess of $146,110.00 would be applied toward the constructive trust amount of $299,720.00. The judgment, when read in connection with the trial court's findings of fact and conclusions of law, does not allow respondents a double recovery of their judgment for damages. Perhaps the judgment could have been worded in more definite terms in negating the possibility of a double recovery. Its shortcomings, if any, however, are not substantial enough to warrant a remand to the trial court only for clarification of the judgment language. *Madget v. Jenkins*, 461 S.W.2d 768, 776[10] (Mo.1970).

In Point X appellants assert that the trial court erred in declaring an equitable lien on deeds of trust received by appellant Boulevard upon resale of the hotel. They reason the court misapplied the law by failing to consider whether other relief granted was sufficient and because there was no substantial evidence of an agreement that the Bar-Val deeds of trust would serve as security for any debt or obligation. Appellants' point is without merit and therefore is denied.

■ An equitable lien is a remedial device that provides a method for the enforcement of an obligation. The equitable lien attaches to the property for the purpose of securing payment of the existing obligation and is ancillary to and separate from the debt. 51 Am.Jur.2d *Liens* § 22 (1970).

■ The requirements to establish an equitable lien include: 1) a duty or an obligation owing by one person to another; 2) a res to which that obligation fastens, which can be identified or described with reasonable certainty; and an intent, express or implied, that the property serve as security for the payment of the debt or obligation. *Hartog v. Siegler*, 615 S.W.2d 632, 639 [19] (Mo.App.1981).

■ The trial court found that each of these requirements was met in the present case. The obligation in this case is appellants' duty to pay respondents the money judgment entered in respondents' favor. The res to which the lien attaches is the leasehold estate in the Bel Air West Motor Hotel. Boulevard resold this property prior to trial and received a note and two deeds of trust from the new purchaser, Bar-Val. Equity allows a lien to be placed on the proceeds of the sale of property on which an obligation is owed. *Miller v. Heisler*, 187 S.W.2d 485, 491 (Mo.App. 1945).

■ Therefore, the trial court reasoned, logically, that because Boulevard no longer owned the Bel Air West Hotel, but did own the proceeds of its sale, the Bar-Val deeds of trust, an equitable lien should attach to those deeds of trust. The trial court also found that the required intent that the proceeds of the sale of the property act as security for appellants' obligation could be implied from the contract between the parties in which appellants promised to convey the property to respondents for valuable consideration. The trial court was also persuaded by general equitable considerations to impose an equitable lien. *Bennett Construction Co., Inc. v. Allen Gardens, Inc.*, 433 F.Supp. 825, 834–35 (W.D.Mo.1977).

Appellants complain that the equitable lien was unnecessary because the court

failed to consider whether the monetary damages entered in respondents' favor on Counts II and IV afforded sufficient relief. This argument ignores the fact that the trial court imposed the equitable lien to secure the payment of the monetary damages, not to create a new obligation.

The trial court stated in its conclusions of law that the equitable lien was granted in this case because Boulevard resold the hotel, its only asset, and therefore the lien on the proceeds of the sale was proper to secure payment of Boulevard's obligation to pay the money judgment entered by the court. In effect, the trial court attempted to prohibit Boulevard from resisting payment of the judgment by claiming it no longer held any assets from which the judgment could be executed.

Appellants also contend that there was no substantial evidence of an agreement that the Bar-Val deeds of trust would serve as security for any debt or obligation. This argument fails to recognize that no express intent or agreement is required. All that is required is an implied intent that the property or its proceeds serve as security for an obligation. There was no misapplication of the law or lack of substantial evidence. Point X is denied.

Appellants allege in Point XI that the trial court erred in entering judgment in respondents' favor on Count V because it misapplied the law by: a) awarding damages for breach of a contract which the court rescinded; b) an abuse of discretion in permitting respondents to adduce evidence in rebuttal and denying appellants the opportunity to present surrebutal evidence; and c) entering a judgment on Count V not based on substantial evidence. This point, too, is denied.

Appellants complain that respondents' claim for damages in Count V based upon the sales agreement are inconsistent with the court's award of rescission of the contract.

Respondents prayed for a $25,000 judgment against appellants for missing personal property and monies received by appellants after retaking possession of the hotel, but due respondents for their opera-

tion of the hotel while in possession. The court awarded respondents $7,489.00 and included these damages in respondents' total award of $445,830.00, due before offsets, based on restitution relief pursuant to Counts II and IV of respondents' petition. Therefore, the court did not award this $7,489.00 amount as separate damages based solely on the contract, but instead included these damages as part of the award of restitution entered for respondents. Appellants' argument that this damage award is inconsistent because the contract was rescinded has no merit.

Appellants also complain that the trial court erred in allowing respondents to introduce additional evidence concerning the claims in Count V during rebuttal. Appellants argue that respondents failed to offer a sufficient reason as to why this evidence was first offered in rebuttal and that the court abused its discretion in allowing the evidence at that time.

A trial court may in its sound discretion allow a case to be reopened to hear evidence on the issues. *Collins v. Cowger,* 283 S.W.2d 554, 559 [1–4] (Mo. 1955). A party must ask for permission of the court to reopen his case to introduce further evidence on his case in chief. *Id.* In addition, the decision to admit evidence out of order is a matter resting almost entirely within the trial court's discretion. *Marquardt v. Kansas City Southern Railway Co.,* 358 S.W.2d 49, 56 [11, 12] (Mo. banc 1962).

In the present case, this court can find no abuse of discretion in the trial court's decision to allow respondents to present evidence out of order in rebuttal. Likewise, no abuse of discretion occurred when the trial court refused to admit certain evidence of appellants on surrebutal. *See Rutledge v. Baldi,* 392 S.W.2d 244, 248 [6,7] (Mo.1965).

With respect to appellants' contention that no substantial evidence existed to support the judgment because the evidence constituted speculation and conjecture, this court finds the trial court had wide discretion and did not abuse this discretion be-

cause damages need not be proven with exact certainty. *See Truck Insurance Exchange v. Bill Rodekopf Motors,* 623 S.W.2d 612, 614[3] (Mo.App.1981).

Appellants allege in point XII that the trial court erred in entering a judgment against appellant Boulevard on Counts I through VI of its counterclaim because the judgment entered in respondents' favor on Counts II, IV, and V was erroneous as pointed out in appellants' brief and because the trial court's judgment against Boulevard on its counterclaim was against the weight of the evidence. Point XII is denied.

Appellant Boulevard filed a counterclaim against respondents containing six counts. Count I sought damages for respondents' failure to keep the hotel in good order and repair. The trial court specifically found that respondents had kept the hotel in good repair except for certain damages for which it provided offsets to respondents' recovery. Count II sought damages for recovery under the part purchase note due on January 29, 1982, which respondents failed to pay. The trial court rescinded the contract because appellants' misrepresentations created a substantial breach going to the root of the contract excusing respondents' non performance of the contract. *McCollough v. Newton,* 348 S.W.2d 138, 142 (Mo.1961). *B & B Equipment Co., Inc v. Bowen,* 581 S.W.2d 80, 86–87 [4] (Mo.App.1979).

In Counts III and IV, appellants sought damages for breach of contract. The trial court found that appellants were entitled to some or most of the monies sought as an offset.

In Count V, appellants sought damages for unjust enrichment. The trial court took the allegations in Count V into account when ordering the offset against respondents' award of damages.

Count VI of appellants' counterclaim sought damages against the guarantors of the purchase note, Arthur Loomstein, Kay Loomstein, and David Weil for the $200,000 payment they did not make on the $400,000 principal installment due January 1982. The guarantors are not liable

for this amount because of appellants' misrepresentation and breach of the contract justifying the court's rescission of the contract. *See Bacon v. Boss,* 290 S.W.2d 207, 210 [2] (Mo.App.1956).

There was no abuse of discretion on the part of the trial court in denying recovery on appellants' counterclaim. Point XII is denied.

The judgment is affirmed.

PUDLOWSKI and CRANDALL, JJ., concur.