In re GERALD HARRIS BUILDER, INC., Debtor.

GERALD HARRIS BUILDER, INC., Plaintiff,

v.

JOMAC CONSTRUCTION COMPANY, INC., Defendant.

Bankruptcy No. 87–00866–BKC–JJB.

Adv. No. 87–0180–BKC–JJB.

United States Bankruptcy Court, E.D. Missouri, E.D.

Sept. 28, 1988.

---

David T. Lumerman, Belleville, Ill., for plaintiff/debtor.

Robert E. Williams, St. Louis, Mo., for defendant.

## MEMORANDUM OPINION

JAMES J. BARTA, Chief Judge.

This matter is based upon a five-count complaint alleging various amounts due Plaintiff as a result of a series of business dealings between the Plaintiff and the De-

fendant. Jomac Construction Company, Inc. (Jomac) has filed an affirmative defense alleging that it is owed monies from Gerald Harris Builder, Inc. (GHB).

Most facts essential to this dispute were hotly contested during the long trial of this adversary complaint. The evidence was often confusing, the witnesses' testimony conflicting, and the Plaintiff's case was somewhat unorganized. As an overview of the more detailed factual analysis which appears later, the following paragraphs set out a synopsis of each count.

In Count I, the Plaintiff requests an accounting of the profit from the construction of a nursing home in Pacific, Missouri, The Pacific Care Center. The Plaintiff asserts that the parties were joint venturers in the project and under the joint venture agreement one-half the profits are due GHB from Jomac. Plaintiff also prays for a money judgment in the amount determined to be due under the accounting.

In Count II, the Plaintiff prays for judgment in the amount of $249,663.63 from Jomac for work GHB performed as a subcontractor in the construction of the Lake Ozark–Osage Beach Waste Water Treatment Plant Project (Lake Ozark Project). The parties entered into a written agreement for the subcontracting of certain work. GHB asserts that this work was in fact completed, and in addition, several other jobs were performed which fall outside the scope of the subcontract. GHB also charges that Jomac owes it for equipment rental for GHB equipment that Jomac used on the project.

Count III involves a subcontract similar to Count II. Jomac was the general contractor on the Highway 63, Boone County, Missouri Project (Highway 63 Project). GHB was a subcontractor which was to perform certain jobs as detailed in the written subcontract. GHB claims it performed certain additional work at the job site for which Jomac is obligated to pay. GHB also prays for damages for Jomac's use of GHB equipment during this project. The amount of damages plead in the Amended Complaint is $173,427.29.

Count IV is the Plaintiff's request to declare as void a $450,000.00 note and security agreement executed on behalf of GHB in favor of Jomac. GHB claims there was no consideration for the note as no funds were disbursed under the agreement.

Count V is a prayer for damages arising out of Jomac's use of GHB equipment and GHB's performance of certain services on various job sites: (1) Boone County Culvert: Plaintiff requests $76,750.00 for Jomac rental and use of GHB equipment; (2) Highway 44 (Crawford County) improvements: Plaintiff requests $19,000.00 for Jomac rental and use of GHB equipment; (3) Highway 44 (St. Clair) improvement: Plaintiff requests $12,000.00 for rental of a truck; (4) I–70 Bridge Project: Plaintiff requests $22,750.00 for rental of equipment.

By affirmative defense, the Defendant alleges GHB is indebted to Jomac in the amount of $588,274.74. This amount was calculated from the alleged amounts owed as balances due Jomac from the Lake Ozark and Highway 63 Projects, plus an amount for Jomac's clerical time expended, and for interest due on the $450,000.00 note referred to in Count IV. At trial, these amounts were reduced to conform to the evidence.

Under the circumstances of this case, it is appropriate to give a brief description of the entities involved here. The Plaintiff, Gerald Harris Builder, Inc., is owned by Gerald and Norma Harris. A Chapter 11 Bankruptcy Petition was filed for Gerald Harris Builder, Inc. on March 26, 1987. The principal business of the Debtor is general contracting. Gerald Harris is the President of the company and his daughter, Mary Ann Brinkley, is the office person and bookkeeper. Each has a high school education.

GHB first became involved with Jomac in 1983 when John McClure and McClure's father owned Jomac. Jomac eventually became affiliated with Kloster Building Group, Inc., which is a holding company for certain entities involved in the construction industry. McClure retained his employment with Jomac for a time after Kloster's

involvement but left under strained circumstances.

The parties to this action were involved in the three major projects outlined supra and had certain dealings in smaller projects. In the early stages of the relationship, there was apparent harmony, but the honeymoon ended and the disagreements giving rise to this action arose. Each Count of Plaintiff's Amended Complaint shall be addressed in turn.

## PROFESSIONAL CARE CENTER

### COUNT I

■ In December, 1985, the parties entered into a standard contract wherein GHB was to be the subcontractor and Jomac the general contractor. GHB was to perform excavation, concrete, carpentry, insulation, facia and soffit and light gauge framing. The lump sum to be paid GHB for this work was $407,004.00.

On or about January 31, 1986, Jomac sent a letter to GHB outlining an apparent additional agreement which stated:

"Gerald Harris Builders, Inc. agrees to provide the following in the construction of the Pacific Care Center in consideration for 50% of the profit or loss on the above referenced project:

*Supervision
*Development of Labor Force required
*Construction Expertise

Cost records will be kept by JOMAC Construction Company, Inc."

GHB takes the position that Jomac and GHB were joint venturers in this project. The Defendant claims the relationship was only of subcontractor and contractor. The Court finds, however, that the relationship on this project was more than merely a contractor/subcontractor. The January 31, 1986 letter is evidence of an agreement to share in the *profit or loss* in this project. This acceptance of the risk of loss removed the relationship from one of mere contractor to subcontractor. Whether it is to be considered a joint venture or a partnership or some loose-structured ambiguous entity is not determinative of any substantive issue remaining between the parties regarding this project.

This Count of the amended complaint sought an accounting. The evidence at trial was that the books and records had been produced for the Plaintiff's accountant in the framework of this case. An accounting is no longer necessary.

As a result of Plaintiff's review of the books and records regarding this project, the Court must determine several issues regarding compilation of profit under the January 31, 1986 letter agreement.

A certified public accountant for GHB reviewed the books and records of the Professional Care Center (PCC) construction projects. The parties are in agreement that a bill in the amount of $1,663.90 for Woodward Clyde Consultants was not a proper expense to the PCC Project. At trial, Jomac's witness admitted that a $150,000.00 loan to the PCC owners was not a proper expense of the project and credit would be given on that point.

■ One item of contention with regard to the project was the $10,589.10 paid to Kloster Building Group for a management fee. Although this sum was charged during the month of September, there is no evidence that this was to be a fee for the month of September. Testimony revealed that the amount was a proportionate share of Jomac's annual overhead expense. The Court finds that this item is not an unusual expense item. Nor does the agreement between the parties preclude such an expense. The amount should be included as an expense to be charged against the total in order to determine the profit on the project.

An additional matter challenged by the Plaintiff was a charge for certain plumbing expenses. The testimony regarding this matter was neither clear nor persuasive and the issue cannot be ruled in favor of Plaintiff.

■ A final issue is whether any amount would be due GHB under a loan Jomac made to the owners of PCC. This loan was apparently for operating expenses for the nursing home. The agreement between

GHB and Jomac deals only with the profit or loss from construction under the project. GHB would not be responsible for, nor receive any benefit from, the separate agreement Jomac made with the PCC owner to lend monies. Thus, this is not an appropriately includable expense item.

The Defendant has provided this Court with a statement of account which reflects that GHB is due $225,000.00 on the PCC Project. This statement takes into account the items at issue and determined here. This Court has found no credible evidence to support the theory that any additional sums are due Plaintiff under the agreement.

The testimony with respect to the Pacific Care Project included several references to the Debtor's interest in an amount of money which may be due from the owners of this project. It appears that the value of the Debtor's interest will not be greater than $150,000.00. To the extent that this amount may be due from the owners and not from JOMAC, neither the Debtor's right to claim this amount, nor the value of the Debtor's claim are determined by this proceeding. JOMAC has suggested, however, that it does not dispute the fact that the Debtor holds a claim to the fund.

### LAKE OZARK PROJECT

### COUNT II

Jomac was the general contractor for the construction of the Lake Ozark–Osage Beach Waste Water Treatment Plant in southern Missouri. GHB was the subcontractor for a portion of that job. GHB was to do the "earthwork" on the project for the sum of $494,750.00 plus an amount determined by the cubic yard of rock which was to be drilled.

From the testimony, it appears that there was no dispute that GHB was owed $187,-800.00 for certain additional rock work. This was established by the Debtor at a payment of $2.00 per cubic yard for 93,900 cubic yards of rock.

█ Other provisions of the subcontract agreement for this project provided that a request for work which was outside the scope of the written subcontract was to be authorized in writing. This so-called "extra-work" on the various projects was the subject of much of this litigation. The evidence was clear with regard to certain matters which were documented in writing as to the GHB equipment used and the length of time involved. The parties understood the price per hour would be subject to later negotiation. Gerald Harris testified as to the hourly rates he would charge for the use of his equipment. Defendant also introduced testimony which substantially corroborated Gerald Harris' testimony on rates GHB would charge. The Defendant's witness was unfamiliar with rates generally charged in out-state Missouri and was more familiar with Metropolitan St. Louis rates where competition might be substantially higher. This Court will accept the rates offered by Gerald Harris as appropriate. The exhibits reflect $19,183.50 was due GHB for work performed which was outside the scope of the original subcontract but performed upon written authorization from Jomac. There is no reason why Plaintiff should not be allowed this amount.

█ GHB also claims $995.00 for clearing a right of way to permit a utility company to supply electricity to the project. The credible testimony of the former Jomac project manager for the Lake Ozark Project was that he had requested Gerald Harris to perform this work. The Court will allow this item as an amount due GHB.

All other amounts claimed by GHB as due on the Lake Ozark Project are troublesome for this Court, in that they are based in large part on conflicting testimony by parties in interest or former employees who may have a grudge against the Defendant. The Plaintiff's testimony on many of these issues was replete with hearsay, propounded in narrative form, and the result of leading questions. The questions were often formulated with reference to the wrong exhibit. It was a confused presentation which suggested inadequate preparation or the absence of solid evidence to support the Plaintiff's position.

GHB claimed that a 1971 truck was on the Lake Ozark Project site. Testimony ranged widely with regard to the length of time the truck was on the project, and with regard to the use of the vehicle. One witness testified to the fact that the vehicle was used by Jomac and GHB personnel on an "as needed" basis.

It is clear that there was no specific contract between the parties on this issue. There was no written agreement, or any "meeting of the minds" with regard to the use of this truck. The parties were generally in agreement that both Jomac and GHB employees used the truck on the Lake Ozark Project site. The Plaintiff then argues that its right to a judgment is based on a theory of *quantum meruit.* However, application of that theory to the record here would require that the Court attempt to guess and estimate what portion of each day and during what time period the 1971 truck was used by Jomac. It would be fundamentally unfair to Jomac to conclude that it is obligated to pay the entire rent on a truck GHB seemed willing to allow Jomac to use as well as using the vehicle itself when needed. *Quantum meruit* is an equitable principle, which should be applied with a sense of fair play. Even though damages need not be proven with absolute precision, the record must present a realistic basis for a determination by the Court.[1] Here we have a truck, allowed to be used by either party at the construction site. The credible testimony was that the truck was at the site for nine months. GHB seeks $1,000.00 per month rental. A substantial reduction must be made in the figure requested as the evidence plainly proves the vehicle was used by both parties. The evidence suggests the truck was used very frequently by Jomac and was of substantial help in allowing Jomac to perform its obligations as a general contractor at the site. The Court concludes that an even division of the fair rental value would be appropriate. The truck was on the job site for nine months and, thus, Gerald Harris Builder is allowed $4,500.00 as the rental fee due from JOMAC.

GHB has also requested that this Court allow an additional $12,300.00 for "equipment rental". GHB asserts it performed several jobs at the Lake Ozark Project site which were outside the scope of the subcontract. None of these were authorized in writing. GHB now seeks to recover the reasonable rental charge for the equipment used to perform these various tasks for Jomac. All sums requested include a charge for an operator of the equipment. Each category of work will be addressed individually by this Court.

First, GHB charges that Jomac owes $7,200.00 for equipment rental for the construction of a "bar pit". A "borrow pit" or "bar pit" would generally be dug to gather dirt if insufficient dirt is at a job site. Here, the location of the bar pit was on the subject property but just off the actual job site. GHB takes the position that Jomac is responsible for costs incurred in digging the bar pit, as the contract specifically calls for Jomac to provide all construction materials. Jomac argues the digging of the bar pit was within the scope of the subcontract and, therefore, GHB is not entitled to additional compensation. The most credible testimony was from Richard Carden, the Lake Ozark Project manager. He testified that if they had to go off the site for dirt, it would be an extra. Thus, the bar pit would be an extra and GHB will be allowed the amount requested on this item.

GHB also requests payment of equipment rental charges for the construction of a lagoon, the cleanout of a ditch, other work on a ditch and work on a pond. GHB claims that these are outside the scope of the original subcontract and, thus, can be recovered as "extras". Jomac charges some of this work was not done by GHB, and that the portion which was completed was traded off in exchange for GHB not performing certain "rip rap" work.

---

1. The standard for assessing damages in an action in quantum meruit is a relaxed one. See *Iota Management Corp. v. Boulevard Investment Company,* 731 S.W.2d 399 (Mo.App.E.D.1987). This Court has been conscious of this standard in this case.

■ There is no written document reflecting any agreement between the parties regarding any of those matters. This Court is left with only the testimony of witnesses, which at times in this trial, was conflicting. This Court accepts the testimony of Richard Carden. He stated that the ditch cleanout was an extra as it was not contemplated under the contract with the owner. This Court will allow GHB $2,140.00 for the ditch cleanout and other ditch work.

■ An employee of one of the Kloster entities testified that the lagoon would have been an extra under the contract. Jomac's position is that this was a "trade-off" for not placing rip rap at the project site. This Court is not in agreement with JOMAC. There was no credible evidence that this was an agreed trade-off. Gerald Harris testified he placed rip rap on the job site and the evidence to the contrary was not credible. Gerald Harris Builder will be allowed $2,210.00 for the lagoon as an extra on the Lake Ozark Project.

■ GHB has also requested $31,500.00 for rental of three pieces of equipment used at the Lake Ozark Project site. The credible testimony was that this type of equipment would be used by GHB in performing under its subcontract. Even if the equipment remained on the job site after GHB completed its work, this Court is not convinced that there was any rental to Jomac. Further, there was little evidence to suggest that Jomac used this equipment. If such use did occur, it was in connection with work GHB was obligated to perform under the subcontract agreement.

The evidence suggested that there may have been many more tickets for extras than the few that were produced in this case. Unfortunately, only a few remain in existence. Without credible testimony, this Court can only speculate as to what was authorized and what was not. The speculation asked of the Court is too broad with regard to these three pieces of equipment. The record has not established that Jomac used the equipment and, thus, Plaintiff's request will be denied.

The last item on the Lake Ozark Project is $2,031.48 for a repair bill which GHB alleges Jomac agreed to pay. This Court believes the credible testimony on the issue to be that of Gerald Harris. Jomac agreed to pay the repair bill. The amount requested ($2,031.48) will be allowed to Plaintiff.

The total of all amounts due Gerald Harris Building on the Lake Ozark Project as determined by this Court is $720,809.98, as follows:

| | |
|---|---|
| $494,750.00 | Contract Price |
| 187,800.00 | Additional Rock |
| 19,183.50 | Extras |
| 995.00 | Right of Way |
| 4,500.00 | Truck Rental |
| 7,200.00 | Bar Pit |
| 2,140.00 | Ditch Cleanout |
| 2,210.00 | Lagoon |
| 2,031.48 | Repair Bill |
| $720,809.98 | TOTAL DUE GHB |

Jomac and GHB are not in agreement as to the amount paid to GHB on this project. The more credible testimony on this point was from Jomac. The combination of payments made directly to GHB and those made on behalf of GHB total $692,020.00.

If this Court compares the amount paid to or on behalf of Gerald Harris Builder by Jomac to the amounts determined to be due GHB, GHB is owed $28,789.98.

■ Jomac argues that GHB is liable for copying charges and clerical services it provided GHB. This record establishes that Jomac volunteered to pay GHB's debts to protect itself from potential liability under its construction bond. Clerical and copying expenses will not be charged to GHB where, as here, the service was volunteered and was of benefit to Jomac.

According to the above analysis, judgment will be entered in favor of GHB and against Jomac in the amount of $28,789.98 on Count II of this Petition.

### HIGHWAY 63 PROJECT

### COUNT III

The Highway 63 Project was the cause of the problems between these parties. GHB was the subcontractor and Jomac was the general contractor on the project. The

job was beset with a variety of problems and delays. The parties are in disagreement as to the cause of these various problems.

■■■ GHB bid on the project after Gerald Harris inspected the job site. He knew excavation could be difficult as a great majority of the work might consist of drilling, shooting and removing rock. No one could estimate how long this would take. The exact quantity of rock could not be predicted. In order to protect himself from the effects of miscalculating the quantity of rock which was to be removed, Gerald Harris negotiated what he refers to as a "rock clause". The subcontract was in the amount of $1,491,222.20 for the excavation and various construction items GHB was to perform. At the bottom of the subcontract page which lists all of the GHB responsibilities, this sentence appears: "Any required drilling and shooting of rock excavation will be done by Jomac at their expense". GHB now seeks to apply this clause to collect $62,000.00 for rental of a track drill with an operator.

The appropriateness of this item is centered on the correct interpretation of the "rock clause". Gerald Harris and John McClure seemed to have been in agreement at the time the contract was made that Jomac was to pay for drilling and shooting. McClure was president of Jomac at the time the Highway 63 Project began. The track drill was in fact used for this purpose. Jomac claims it had other equipment on the job site which performed drilling and shooting of rock. The evidence does not refute this; but the fact remains that the track drill was on the site for a substantial period of time for the purpose of drilling and shooting. The testimony establishes that the track drill was on the Highway 63 Project site until July, 1985. The rental rate as established at the trial by Gerald Harris was fair and reasonable and the amount requested will be allowed GHB.

■■■ GHB also requests $3,425.47 for equipment repair on a motor grader. Jomac had used this equipment in rough terrain and thereafter it needed substantial repair. Gerald Harris testified that GHB and Jomac made an agreement under which GHB would repair the equipment and Jomac was to purchase the parts. Jomac did purchase the parts but charged GHB for the amount which was in excess of what was covered under Jomac's insurance policy. GHB paid this but now requests reimbursement from Jomac.

The GHB claim will be allowed on this item because the testimony of Gerald Harris on this issue was credible. Jomac agreed to take on the responsibility for supplying the parts because it believed an insurance company would pay for the necessary items. The insurance company paid for only a portion of the expense. Jomac should not be relieved of its responsibility for the balance of the amount due for the parts, as required by the parties' agreement. Nothing on the record indicates that the agreement was contingent upon the insurance company paying in full the amount of the parts needed for the job. GHB will be allowed $3,425.47 for these repairs.

The bulk of the amount requested by Plaintiff on this Count is $174,678.00 for "extra work" GHB claims to have performed on the Highway 63 Project. The method used to compute this amount is similar to that used in Plaintiff's other requests. That is, equipment used is identified, the hours required for the work are listed, and the rental rate is then multiplied by the hours.

Many of these issues are disputed by the parties. The Plaintiff asserts certain jobs were performed in addition to those required under the subcontract agreement. The hours asserted are challenged by Jomac as excessive. Jomac produced a witness who presented his opinion of the length of time it would take to perform various tasks. Gerald Harris and John McClure collaborated on a written document produced at trial regarding the amount of time the tasks would take. Each witness testified to their best belief and knowledge and each calculation involved some degree of speculation. On the whole, the Plaintiff's evidence seemed cred-

ible except in certain instances where Defendant's testimonial evidence from the Highway 63 Project Superintendent revealed the Plaintiff's time estimates were exaggerated. The testimony of Tom Downey on behalf of Jomac corroborated a substantial portion of the Plaintiff's claim and seemed credible on the use of this equipment at the Highway 63 Project site. The testimony of Gerald Harris with regard to the rate charged was credible and shall be accepted in determining the issues here.

Accepting the charges presented by Gerald Harris for the use of the equipment and Gerald Harris' time calculations except where Tom Downey specifically did not agree with these, the extras for the Highway 63 Project which were performed by GHB will be allowed as follows:

| | | |
|---|---|---|
| I | Sta. 11 and 73 Rt. L Install CLA Underdrain 42LF | $ 504.00 |
| II | Placing of 393 TORS Crushed Stone B | 1,572.00 |
| III | 100 LF of steel pipe | 450.00 |
| IV | Install CMP at several locations | 2,544.00 |
| V | Remove Concrete, Waste, Etc. Sta. 1006 to 1025 Rt. | 2,900.00 |
| VI | Removal of temporary crossovers in median and reworking median ditch | 11,000.00 |
| VII | Cut down shoulder for two-way construction | 1,920.00 |
| VIII | Dress Slopes | 800.00 |
| IX | Rental 16 Dozer | 4,000.00 |
| X | From South E. OIP to North end on paving mainline; cut down right shoulder and build up left | 20,400.00 |
| XI | RteB widening-cut east side of final grade | 7,980.00 |
| XII | RteB—cut shoulders in lieu of using trimmer on east and west side | 2,840.00 |
| XIII | Ramps 3 and 4 at RteB—cut base rock to final grade trim | 4,544.00 |
| XIV | Fine grade, lay and trim base rock for construction of asphalt x-over at intersection | 4,744.00 |
| XV | Push Rip Rap | 4,000.00 |
| XVI | Pushing out Rip Rap pad at Hinkson Creek | 4,800.00 |
| XVII | Restore unpaved lane | Not Allowed as within the contract. |
| XVIII | Restore shoulders on left and right side of mainline 63 | 23,000.00 |
| XIX | Recut taper on Mexico Gravel Road (three times) | 2,800.00 |
| | **TOTAL** | **$102,718.00** |

■ There are several arguments asserted by Jomac as defenses to these charges claimed to be due from Jomac to GHB. Jomac argues that these extras were not in writing as required under the subcontract. This Court is not persuaded by this as there is clear evidence that these tasks were performed by GHB at the request of Jomac personnel. Defendant's evidence supports this conclusion as well. Where the evidence is clear that the task was performed, this Court will not deny Plaintiff recovery on this point. Further, there is only one specific instance which is noted on the detail of the extra work listed above on which the testimony was convincing that the work performed was within the original subcontract. This item was not allowed for that reason.

■ Jomac argues much of this sum is not due GHB because Jomac was already leasing a great deal of the equipment used to perform these tasks. The lease referred to is an actual lease under which Jomac was obligated to pay a monthly lease payment for the equipment.

The testimony at trial suggested the reason for the arrangement. During the Highway 63 Project, Jomac became increasingly concerned about its obligation under its construction bond. This concern was in large part due to the inability of GHB to pay its suppliers. GHB acknowledges that a substantial cash flow problem had developed in the summer of 1985. In September, 1985, Jomac began to pay GHB's suppliers. A series of documents was signed around this time. One was the $450,000.00 note which is the subject of Count IV of this Complaint. This apparently did not satisfy all GHB's suppliers, and CIT Corporation became concerned about the equipment it was already leasing to GHB. CIT threatened to take back the equipment if payment was not guaranteed. Jomac agreed to lease the equipment from CIT, and thus, became obligated to make a monthly payment of $20,728.00. The lease covered the same pieces of equipment GHB was using on the Highway 63 Project site. The testimony and evidence revealed that Jomac would pay CIT each month, but then would charge GHB that same amount.[2] The net result of this transaction was a

---

**2.** The "charge" was applied against what was due GHB under the subcontract for the project. In a similar manner, Jomac was paying many of GHB bills.

financial "wash". GHB was charged what Jomac expended in the monthly lease payment. This Court does not believe that GHB should be denied recovery for the work done on the project while using this equipment. GHB will be allowed to recover on these "extras" from this project as set out in the table above.

■ A final item charged by GHB on this project is for construction of a lake on the private property of a Jomac employee. There was no evidence that Jomac authorized this and the amount will not be allowed GHB.

■ The evidence presented by Jomac is credible regarding the amount paid to or on behalf of GHB for the Highway 63 Project. Testimony revealed $1,791,246.00 was paid to or on behalf of GHB on this project. $1,491,222.20 was due under the subcontract agreement to GHB.[3] This Court has allowed GHB an additional $168,-143.47 for the track drill rental, repairs and extra work discussed previously. Under these calculations, $131,880.33 is due from the Debtor to Jomac.

Jomac also claims copying and clerical charges. These will not be allowed to be recovered from the Debtor.

■ As a last item, Jomac has assessed $61,500.00 in liquidated damages for delays caused by GHB's failure to perform in a timely manner under the Highway 63 Project subcontract. This subcontract specifically allowed the general contractor to make this assessment where the subcontractor was the cause of a delay which resulted in the assessment of liquidated damages by the State of Missouri. Jomac has assigned a large percentage of the liquidated damages assessed under its general contract to GHB. There was substantial evidence that GHB did not conclude the project in a timely manner, but this alone does not answer the question on this issue. The "rock clause" seems to shift ultimate responsibility for drilling and shooting to Jomac. The substantial quantity of rock that would likely be needed to be drilled, shot and removed was the reason for the addition of the clause to the agreement. This Court is not convinced GHB was the sole cause of the delay on the project. Even though Jomac had GHB perform a substantial portion of the drilling and shooting, this Court finds that the correct interpretation of the rock clause, and the contractual agreement negotiated with regard thereto, is that the responsibility for the drilling and shooting would shift to Jomac. Inherent in this interpretation was the parties' agreement to shift the liability for a portion of the delay to Jomac. Upon consideration of this agreement in the circumstances presented in this case, the additional expense resulting from the delayed completion of the project must be shared equally by these parties. Therefore, GHB will be assessed one-half of the liquidated damages for the delay. The record reflects that the State of Missouri assessed liquidated damages in the total amount of $77,-000.00. GHB will be charged in this proceeding with liability for $38,500.00.

The total amount owed by GHB to Jomac on this Court is as follows:

| | |
|---|---|
| $1,491,222.20 | Contract Price |
| 62,000.00 | Track Drill Rental |
| 3,425.47 | Repairs |
| 102,718.00 | Extra Work |
| $1,659,365.67 | SUBTOTAL DUE GHB |
| −1,791,246.00 | Paid by Jomac |
| −38,500.00 | Damages Owed to Jomac |
| $−170,380.33 | SUBTOTAL DUE GHB |

Therefore, the Court has determined that the amount paid by Jomac to or on behalf of GHB was greater than the amount determined to be due GHB as a result of this proceeding. The net result is that with respect to Count III of this complaint, GHB owes Jomac the sum of $170,380.33.

3. This figure reflects the original amount due under the contract. Defendant claims only $1,388,780.60 was due under the contract because Jomac had been required to complete some Class Three excavation (unspecified excavation) and some reinforced pipe work. The testimony was vague and provides no explanation for the calculation of the deduction. This Court will adhere to the amount originally agreed to by the parties.

## THE PROMISSORY NOTE

### COUNT IV

■ As noted earlier, troubles developed between these two entities during the Highway 63 Project. Jomac, realizing its ultimate responsibility to perform under the general contracts in question, agreed to pay most GHB obligations and charged the sum expended against the amount due GHB under the several contracts. Jomac realized that there might be a time when the amount paid out on behalf of GHB or to GHB directly exceeded the amount due under the payout schedule of the various contracts. To protect Jomac's interest, a promissory note to Jomac was executed by Gerald Harris on behalf of GHB in the amount of $450,000.00. A security agreement on certain GHB equipment was also executed. Jomac did not, upon execution of that note, pay over to GHB $450,000.00. That was never intended by the parties. It was to be considered a sum available to be drawn against when the payments Jomac made on behalf of GHB exceeded what was due GHB under the subcontract agreement.

Jomac does not now claim the full amount is due under the note. It only seeks to recover what was paid out to or on behalf of GHB which is over and above what was owed under the contracts. Interest under the note has also been calculated.[4]

GHB now requests that this Court set aside the note and security agreement. This Court finds no legal basis for doing so. The note and security agreement were validly executed and consideration was given. The consideration was the promise to advance funds up to at least the amount of the note. The facts of this case establish Jomac did advance considerable funds to GHB in advance of those sums being required to be paid out under the subcontract agreement. This Court has been presented with no reason in fact or law to set aside the note and security agreement. The Plaintiff's requested relief under Count IV will be denied.

## MISCELLANEOUS PROJECTS

### COUNT V

■ Count V is the GHB attempt to recover for several short projects at which Jomac used GHB equipment and laborers. None of these are the subject of any written subcontract. Accurate records regarding the use of the equipment and the time the equipment was used do not exist. Testimony on what work was performed was generally not presented by those individuals who did the work or who closely supervised it, but by others, who speculated as to the time the job took. While there was evidence that these jobs were in fact performed by GHB, there was no credible evidence detailing the amount of time spent on the project with any degree of certainty. The evidence presented was substantially conjecture. The documentary evidence consisted solely of undated statements signed by a former employer of Jomac. There was a strong inference that this written authorization came only after he left Jomac. One item, the Boone County Culvert job, was performed as a trade for other work being done by Jomac for GHB at no charge.

■ The sole item which this Court believes could legitimately be recovered against Jomac is for the wreck of a 1973 GMC truck. The fair market value of the vehicle was $20,000.00. The testimony of Gerald Harris on this issue was credible. GHB will be allowed to recover that amount for the truck. Jomac was responsible for its loss and agreed to make reparation for its value. All other amounts were only determined by a method which seemed closer to guessing than any other calculation. This Court cannot allow Plain-

---

**4.** The former Jomac office manager credibly testified that she began calculating interest when the amount paid to or on behalf of GHB was in excess of the amount due under the contract. This Court will not vary that amount as all parties agreed the amount due on various extras would be settled after the job was completed. Therefore, it seems the calculation of interest was within the realm of what would have been negotiated along with the promissory note.

tiff to recover on these items other than the value of the truck.

## CONCLUSION

This Court has allowed GHB recovery on several of the Counts in this Complaint. The total amount allowed GHB is $103,-409.65, which reflects a set-off for the amount determined as due Jomac under Count III as follows:

Count I $225,000 Jomac owes GHB
Count II $28,789.98 Jomac owes GHB
Count V $20,000.00 Jomac owes GHB
Count III $170,380.33 GHB owes Jomac

This figure must be reduced by the amount of interest which the Defendant could legitimately charge Plaintiff.

 Interest was calculated by Jomac with no consideration for the extras allowed in this proceeding. The figure, however, does take into account and give credit for positive balances due on the Lake Ozark Project during certain periods. The interest amount was calculated on the *net* amount due on the two major projects, Lake Ozark and Highway 63. This method of calculation is appropriate under the circumstances of this case. The parties entered into a promissory note with an agreed rate of interest. Using the net balance due Jomac under the note for each month is reasonable. Further, no adjustment need be made for the extras allowed here as generally extras are not paid until the end of a contract. The allowed sum calculated upon the amounts due for pre-petition periods is $43,458.00.[5] Thus, $59,-951.65 is determined to be due GHB from Jomac. Consistent with this Memorandum Opinion, a judgment shall enter this date in favor of Plaintiff and against the Defendant in that amount.

---

5. This figure was calculated by a former Jomac office manager, and admitted in this proceeding

as part of Plaintiff's Exhibit QQ.