M.J. "Bob" GROOTHAND and Sharon
L. Groothand, Appellants,

v.

Kurt Duane SCHLUETER and Mary
Morris Schlueter, Respondents.

Nos. WD 52770, WD 52820.

Missouri Court of Appeals,
Western District.

Aug. 12, 1997.

Rexford H. Caruthers, St. Louis, for Appellants.

John A. Ruth, Jefferson City, for Respondents.

Before ELLIS, P.J., and LOWENSTEIN and HOWARD, JJ.

HOWARD, Judge.

Plaintiffs M.J. "Bob" and Sharon Groothand appeal from a court-tried case in the Circuit Court of Cole County. The Groothands filed a petition seeking damages from Defendants Kurt and Mary Schlueter for breach of contract after the Schlueters refused to close on a contract for the purchase of the Groothands' home. The Schlueters counterclaimed seeking rescission of the contract, return of an earnest money deposit, and consequential damages to return them to the status quo they occupied prior to entering into the contract. They contended that the Groothands misrepresented the condition of the house to induce them to buy it. The trial court, in its findings of fact and conclusions of law, found that the Groothands falsely represented the condition of the house. It entered judgment against the Groothands on their claim for breach of contract, and granted the Schlueters' counterclaim for rescission of the contract and for return of the $5,000.00 earnest money. The court denied the Schlueters' request for damages.

On appeal, the Groothands claim the trial court erred in granting the rescission because the evidence did not support a finding that the Schlueters proved all of the elements of fraud. In a cross-appeal, the Schlueters claim the court erred in denying them consequential damages for expenses they incurred—several months rent, extra moving costs, and storage costs—when they sold their house expecting to move into the Groothands' house. We affirm the judgment of the trial court.

### Standard of Review

Since this was a court-tried case, the standard of review is governed by *Murphy v. Carron*, 536 S.W.2d 30 (Mo. banc 1976). An appellate court must affirm the trial court's judgment unless (1) there is no substantial evidence to support it; (2) the judgment is against the weight of the evidence; or (3) the

trial court erroneously declared or applied the law. *Id.* at 32. When reviewing the sufficiency of the evidence, this Court accepts as true the evidence and inferences from the evidence favorable to the result below, and disregards all contrary evidence. *T.B.G. v. C.A.G.,* 772 S.W.2d 653, 654 (Mo.1989). When there is conflicting evidence, the trial court determines the credibility of the witnesses, accepting or rejecting all, part or none of the testimony. *Greenberg v. Dowdy,* 930 S.W.2d 512, 514 (Mo.App. E.D.1996).

## BACKGROUND

On September 28, 1994, the Groothands entered into a contract to sell their home to the Schlueters. Before the parties entered into the contract, the Groothands gave the Schlueters a disclosure statement dated August 7, 1994. This statement is a standard form which includes a checklist of various property conditions and improvements, such as structure, roof, plumbing, etc. Basically, it informs the buyer of any problems with the property. There is some boilerplate language that states that the statement is not a warranty of any kind by the seller, and that it is not a substitute for any inspection or warranties the buyer may wish to obtain.

There are a few disclosures in the statement that are relevant to this case. The Groothands indicated that they had fixed a structural problem that was causing water to permeate through the walls and foundation on the west side of the house during wet weather. They did not mention any other structural problems. The Groothands also indicated that the property had no settling problems and no known history of repairs to the roof. Finally, they indicated that other than a defective intercom system, there were no other facts or information relating to the property that would be of concern to a buyer, other than the information already disclosed.

After receiving the disclosure statement the Schlueters decided to buy the house. The parties agreed on a purchase price of $209,000. The Schlueters paid $5,000 earnest money to the Groothands as a downpayment, and agreed to pay the remaining balance of $204,000 by the closing date, November 1, 1994. Attached to the contract was a "Property Inspection Rider" that said the Schlueters had the right to hire independent inspectors to inspect the property. It further stated that if they found any defects unacceptable to them, they had fourteen days from the date of the contract to report the defects to the Groothands in an addendum. If the Groothands chose not to repair any reported defects, then the Schlueters could cancel the contract.

The Schlueters told their real estate agent to arrange for a termite inspection, a mechanical inspection, and a structural inspection. The first two inspections were completed, but no structural inspection was ever conducted. Also, the Schlueters' bank arranged for an appraisal. The appraised value of the house was $209,000.

On October 12, 1994, about two weeks after signing the contract, Mr. Schlueter received a call from a friend, Gerald Roark. Roark is an attorney who had done some legal work for Schlueter in the past. Schlueter had seen him a few days earlier and had told him that he was going to buy the Groothands' house. It turns out that Roark's law firm had defended the previous owners of the house, Dr. and Mrs. Roger Nail, in a case filed by the Groothands in 1993. The Groothands, who purchased the house for $135,000 from the Nails in September, 1992, had sued the Nails for fraudulently misrepresenting the condition of the property. In their petition against the Nails, the Groothands alleged numerous structural problems with the house, and claimed that in its true condition the house was worth not more than $75,000. Eventually the Groothands settled their case with the Nails for $6,000, but not before Mr. Groothand gave a deposition on March 29, 1994. During this deposition, Mr. Groothand testified about structural problems with the property that had been identified by various inspectors and contractors. The following are some of Mr. Groothand's responses when questioned about the alleged structural problems:

A. Let me put it this way: I have talked to a contractor in Holts Summit. Randy Mull, who told me that—he went up in the attic, I did not—because of the shifting of

the house that the electrical wiring is "as tight as banjo strings."

He has told me that the house—right along where the basement meets the slab, there is a crack, and there is physically a crack, as I showed Mr. Nail in a photograph, that runs the entire length of the house, right up to the living room. The house, therefore, is on a—let me call it a tent-pole effect, that one area slopes off to the—to the east.

\* \* \* \* \* \*

A. Well, the hydrostatic pressure apparently—and I am not an engineer, but what I have been told by various different contractors who all sing from the same hymn book is that the massive crack that runs the entire length of the house, that I pointed out to Mr. Nail at my office visit to him, has caused a tent-pole effect for one part of the house to be leaning in one direction and the other part of the house leaning in another direction.

Roark gave a copy of the deposition to Mr. Schlueter, and told him to read it very carefully. Mr. Schlueter read the deposition that day and then immediately informed his real estate agent that they no longer wanted to buy the property. One week later, on October 19, 1994, the Schlueters gave written notice that they were rescinding the contract because the Groothands misrepresented the condition of the property in the disclosure statement. The closing date arrived and the Schlueters did not show up.

In December, 1994, the Groothands filed suit against the Schlueters for specific performance. Meanwhile, they put the house back on the market. In June they sold the house to Charles and Mary Flanigan for $120,000. Mr. Flanigan is a builder and is in the business of rehabilitating houses. After selling their house, the Groothands amended their petition to a claim for damages for breach of contract.

Several contractors have examined the house for structural problems since the Groothands purchased it from the Nails. Three of them testified as experts in the present case: Randal Mull, J.W. Callison, and Fred Giesler. Mull testified for the Schlueters, while the latter two testified for the Groothands.

Randal Mull, a general contractor, was the first to inspect the house when the Groothands noticed water problems on the west side. While examining the house, Mull discovered several other conditions that he thought were symptoms of serious structural problems. In addition to the leakage problems on the west side of the house, Mull believed that the eastern portion of the house was splitting apart from the rest of the house along a crack running through the foundation from south to north. Other than inspecting the house and providing estimates, Mull never did any work on the house.

J.W. Callison first saw the house in December, 1993. He repaired the water-leakage problem on the west side of the house and also did extensive cosmetic work throughout the house. Although Callison finished working on the house in April or May of 1994, he had told Mr. Groothand in February—several weeks before Mr. Groothand gave his deposition in the Nail case—that he felt there were no serious settling or structural problems. Mr. Groothand never mentioned this in his deposition.

The third expert to testify was Fred Giesler. The Groothands hired Giesler to inspect the house after the Schlueters rescinded the contract. His testimony was basically consistent with Callison's.

## GROOTHANDS' APPEAL

The Groothands raise four points on appeal. In a nutshell, they claim that the trial court erred in ruling that they fraudulently misrepresented the condition of their house. As a result, they argue that the court erroneously granted the Schlueters' claim for rescission, and erroneously denied the Groothands' claim for breach of contract. All four points rest on the threshold issue of whether the court erred in rescinding the contract for fraud. As discussed below, we hold that the court did not err. Therefore, there is no need to discuss the issue of breach of contract.

### Rescission of a Contract Due to Fraudulent Inducement

■ A party who is fraudulently induced to enter a contract may either (1) affirm the contract and sue at law for damages, or (2) disaffirm the contract and sue in equity for rescission. *Osterberger v. Hites Const. Co.*, 599 S.W.2d 221, 227 (Mo.App. E.D.1980); *Cottonhill Inv. Co. v. Boatmen's Nat. Bank of Cape Girardeau*, 887 S.W.2d 742, 744 (Mo.App. S.D.1994). There is an important distinction between these two courses of action which the Schlueters briefly address. The distinction is important because the elements a party must prove to make a prima facie case differ depending upon which course of action the party takes. Under the first option—affirming the contract and suing at law for damages—a party is suing in tort for fraudulent misrepresentation, and must establish the following nine elements: (1) a representation; (2) its falsity; (3) its materiality; (4) the speaker's knowledge of its falsity or ignorance of the truth; (5) the speaker's intent that the representation should be acted on by the hearer in the manner reasonably contemplated; (6) the hearer's ignorance of the falsity of the representation; (7) the hearer's reliance on the representation being true; (8) his right to rely thereon; and (9) the hearer's consequent and proximately-caused injuries. *Colgan v. Washington Realty Co.*, 879 S.W.2d 686, 689 (Mo.App. E.D.1994).

■ When a party instead chooses the second option, as the Schlueters have done—to disaffirm the contract and sue in equity for rescission—there are fewer elements to prove. *Osterberger*, 599 S.W.2d at 227. In *Osterberger*, the Court of Appeals affirmed the trial court's judgment granting rescission to the purchasers of a home who claimed that the sellers had fraudulently concealed the existence of a deed of trust on the house. The court noted that in such situations rescission may be based upon actual fraud or upon a "misrepresentation or concealment made innocently as a result of a misapprehension or mistake." *Id.*

'In actions at law to recover damages for fraud and deceit, it must be shown that false representations were made, with knowledge of their falsity and with fraudulent intent, but where ... an action is brought to rescind a contract on the ground that it was induced by fraudulent representations, it is not necessary to show that the party making the fraudulent representations knew of their falsity, or made them with an intent to cheat and defraud.'

*Id.* (quoting *Ellenburg v. Edward K. Love Realty Co.*, 332 Mo. 766, 59 S.W.2d 625, 629 (Mo.1933)). *See also Cottonhill Inv. Co.*, 887 S.W.2d at 744. Therefore, a party to a contract can rescind if the contract was induced by an innocent misrepresentation. There is no requirement that the party prove the speaker's knowledge of the falsity or intent to cheat or defraud.

On the issue of fraud, the Groothands challenge three specific elements. They argue (1) that the evidence showed that they held a good faith belief that the representations made in the property disclosure statement were true; (2) that the greater weight of the evidence showed that the representations were in fact truthful; and (3) that the Schlueters had no right to rely on the representations.

### The Groothands' Knowledge of the Falsity of Their Representations

■ The Groothands' first argument concerns their knowledge of the falsity of their representations. As detailed above, proof of the speaker's knowledge of the falsity of the representation is required when a party sues at law for damages for fraudulent misrepresentation. *Colgan*, 879 S.W.2d at 689. However, in a suit in equity for the rescission of a contract, proof of the speaker's knowledge is not required. *Osterberger*, 599 S.W.2d at 227. Such is the case here. Therefore, this argument is irrelevant.

### The Falsity of the Representations

■ Next we address the issue of whether the trial court's finding that the representations were false is against the weight of the evidence. We believe there is substantial evidence to support the court's findings, and they are not against the weight of the evidence. The representations made by the

Groothands that the court found to be false were:

(1) that the property had no settling problems;

(2) that the only structural problem with the property involved rock and earth against the west side of the house which had been permanently fixed;

(3) that there was no known history of repairs to the roof; and

(4) that other than an inoperable intercom system, there were no other facts or information (favorable or unfavorable) relating to the property that would be of concern to a buyer other than as disclosed in the disclosure statement.

The court found that these representations were false because there were settling problems on the east side of the house. The settling problems caused related structural problems evidenced by cracks in the foundation walls, separation of the roof to such an extent that a membrane needed to be placed over the separated area to close the gap, and tilting of one of the bedroom floors toward the east.

The evidence available to the court essentially consisted of the testimony of the expert witnesses: Mull, Callison, and Giesler. Mull basically testified that the eastern half of the house was splitting away from the western half along a crack or a fault running through the foundation from the south to the north. Mull claims that he found several problems all consistent with this condition. First, he found a crack in the foundation on the south side of the house. Second, the floor above the basement leaned to the east. Third, the wiring in the attic was pulled very tight. Finally, Mull found that recent patchwork had been completed on the roof, including the installation of a membrane bridge across a gap that had opened up along a fault consistent with the crack in the foundation.

The Groothands assume that since the court's findings were favorable to the Schlueters, it must have relied entirely on the testimony of Mull. They argue that Mull's testimony is in total disagreement with the greater weight of the evidence in this case. They also question Mull's credibility because

there was a stretch of nineteen months between the time he last saw the house and the time the Groothands signed the disclosure statement, and because he never saw the house after Callison did the repair work.

Even if it was true that the court relied entirely on Mull's testimony, we would defer to the court's judgment. When there is conflicting evidence, the trial court determines the credibility of the witnesses, accepting or rejecting all, part or none of the testimony. *Greenberg* 930 S.W.2d at 514. We defer to the trial court's determination, even if the evidence might support a different conclusion. *Id.*

In any event, the court could have made its findings without relying entirely on Mull's testimony because his testimony is not nearly as inconsistent with the other evidence as the Groothands would like us to believe. In fact, there are many similarities. For example, there is no question that the south foundation wall is cracking. Mr. Groothand testified about a fourteen-inch vertical crack with a hole approximately one inch wide. Callison and Giesler also found cracks in the south wall. Callison said that there was settling on the east side of the house that probably caused the crack. Giesler found a quarter-inch thick crack that he said was not a major fault but still constituted a structural defect. Giesler also discovered that concrete had been added along the east exterior wall. He believes this was an attempt to correct a structural problem.

There is also no question that at least part of the floor above the basement leaned somewhat toward the east. Callison attributes this leaning to the fact that the eastern half of the house was built on a wood framing system over the basement, while the western half was built on concrete slab. He believes the wood framing has settled about three-eighths of an inch lower than the concrete, thus causing the uneven floor. To remedy the unevenness, Callison placed an underlayment on the floor where it sloped to make it appear level. He admitted, however, that although the floor now appears level, structurally it still leans.

Finally, there seems to be no disagreement that the roof has had problems. Giesler

confirms the existence of a membrane covering over the middle section of the roof. He also found patchwork on the roof and signs of leakage.

One aspect of the house that the witnesses did not agree about involved something about which the court made no findings—the wiring in the attic. Mull testified that he found the wiring was stretched tightly due to the shifting in the house. He also claims to have loosened some staples put in by the original electricians in order to ease the strain on some of the wires. This could explain why neither Callison nor Giesler found the wiring to be pulled tightly.

In sum, Mull, Callison, and Giesler all found many of the same conditions to exist. The real difference is in their interpretation of these conditions—that is, whether they represent significant structural or settling problems. However, even if we completely disregard Mull's theory that the house was splitting apart along a fault in the foundation, there is more than enough evidence to conclude that some of the Groothands' representations were false. The undisputed facts are that the foundation has cracks in it, the floor above the basement is not structurally level, and the roof has shown signs of leakage and needs a membrane cover to keep it together. These facts all favor the trial court's determination that the house had significant settling and/or structural problems.

### The Schlueters' Right to Rely on the Groothands' Representations

■ The final issue is whether the Schlueters had the right to rely on the Groothands' representations. The Groothands cite two general principles to support their contention that the Schlueters did not have such a right. The first is that "patent defects cannot be made the subject of misrepresentation." *Riley v. White*, 231 S.W.2d 291, 298 (Mo.App.1950). The second is that "where a party makes his own independent investigation, he will be presumed to have been guided by what he learned and the conclusions he reached and will not be permitted to say that he relied on misrepresentations of another and that he was deceived thereby." *Consumers Cooperative Association v. McMahan*, 393 S.W.2d 552, 556 (Mo.1965). For the reasons cited below, we hold that neither of these general principles apply here.

■ The first principle necessarily requires a finding that the defects in the house were patent. The Groothands claim that any defects would have been patent because Mull testified that the problems he found in the house were open and obvious to "anybody that knew how to look" or had "knowledge of the construction of a house." We disagree with this reasoning. If anything, Mull's statement implies the opposite—that the problems were latent. A condition could hardly be considered "open and obvious" if it took a person with knowledge of construction to find it. Also, the facts suggest that some of the problem areas had been concealed. For example, an underlayment had been used to level out the slanting floor on the east side of the house. This gave the appearance that the floor was level even though structurally it still tilted. The defects were not patent, therefore this argument does not stand.

We also are not persuaded by the Groothands' next argument—that the Schlueters could not rely on the representations made in the disclosure statement because they had conducted their own investigation of the house. The reason this argument does not stand is because there are three well-recognized exceptions that practically swallow up the general rule that a party who conducts an independent investigation will not be permitted to say he relied on another's misrepresentation. Each of these exceptions apply to this case.

■ The first exception is that if the party making the independent investigation makes a partial rather than a full investigation, and relies on the misrepresentations as well as the investigation, he may maintain an action for fraud. *Iota Management Corp. v. Boulevard Inv. Co.*, 731 S.W.2d 399, 413 (Mo. App. E.D.1987); *Colgan*, 879 S.W.2d at 690–91; *Brennan v. Molina*, 934 S.W.2d 631, 635 (Mo.App. E.D.1996). This exception applies because the Schlueters never conducted a structural inspection. Therefore, they only partially inspected the house, even though

they viewed the house themselves, had the house appraised, and had it inspected for mechanical problems.

■ The second exception is that where facts are peculiarly within the knowledge of the party making the representations, the buyer may rely on such representations if he does not stand on "equal footing" with the seller and the truth is difficult for the buyer to ascertain. *Iota Management,* 731 S.W.2d at 413; *Colgan,* 879 S.W.2d at 691; *Brennan* 934 S.W.2d at 635. Here, the parties did not stand on equal footing because the Groothands had actually lived in the house. "In the vast majority of cases, a seller, who has lived in a property, as opposed to a mere investor, would have knowledge which is superior to a buyer's knowledge concerning the property's condition." *Colgan,* 879 S.W.2d at 691.

■ The third exception is that if the seller makes a distinct and specific representation, then the buyer has the right to rely on that representation, even if the parties do stand on equal footing or have equal knowledge or means of information. *Iota Management,* 731 S.W.2d at 413; *Colgan,* 879 S.W.2d at 691; *Brennan* 934 S.W.2d at 635. The Groothands made distinct and specific representations in the disclosure statement. Therefore, there is no merit to their argument that the Schlueters could not have relied on the representations because they could have had a structural inspection but chose not to. "The mere presence of opportunities for investigation will not of itself preclude the right of reliance." *Iota Management,* 731 S.W.2d at 414 (Mo.App. E.D. 1987).

We affirm the trial court's grant of rescission to the Schlueters. Since the rescission was proper, the issue of breach of contract is moot and need not be reviewed.

## SCHLUETERS' CROSS–APPEAL

On cross-appeal, the Schlueters contend that the trial court erred in denying their claim for consequential damages such as moving, rental, and storage expenses. The Schlueters claim that in reliance on the contract with the Groothands they arranged to sell their home, and scheduled a closing date of November 21, 1994. Since the Groothands' misrepresentations forced them to rescind the contract, they had no home into which to move on November 21, and had to move into a rental home for several months. The Schlueters argue that by awarding the rescission the court was required to return them to the status quo as if the contract had never existed, and that they cannot truly return to the status quo without receiving the consequential damages.

■ Rescission is an equitable remedy, of which the purpose is to return the parties to the status quo—that is, the position they occupied prior to entering the contract. *Dilts v. Lynch,* 655 S.W.2d 118 (Mo.App. S.D.1983). Applied literally, this remedy would require a return of all money that would not have been expended if the contract had never existed, including consequential or special damages for costs unrelated to the contract or subject matter of the contract, but nevertheless incurred in reliance on the contract.

■ We have found no Missouri cases directly on point with this issue. In most cases dealing with rescission, the award granted was either a return of payments made under the contract (such as purchase money) or restitution for benefits conferred on the nonrescinding party (such as improvements or repairs made by the purchaser before rescission). However, despite this lack of direct authority, there are two cases from which we can infer that the remedy of returning a party to the status quo is not a bright line remedy, but rather one that should be applied on a case-by-case basis as equity requires. The cases are *Osterberger,* 599 S.W.2d 221 and *Harris v. Desisto,* 932 S.W.2d 435 (Mo.App. W.D.1996). In each of these cases the appellate court dealt with the issue of attorneys' fees after affirming the trial court's grant of rescission. The subject of attorneys' fees in a rescission case is somewhat on point in the sense that they, like consequential damages, would not have been incurred if the parties had not contracted with each other in the first place.

In both *Osterberger* and *Harris,* the reviewing courts looked to the general rule that attorneys' fees are not recoverable unless (1) called for by contract, (2) provided for by statute, (3) incurred by the wronged party in collateral litigation, or (4) ordered by a court of equity in order to balance benefits. *Osterberger* at 230; *Harris* at 448. In both cases the courts specifically examined the last of these exceptions—the equitable balancing of benefits. The results, however, were totally different. In *Osterberger,* the court reversed the trial court's award of attorneys' fees because the plaintiffs did not demonstrate "very unusual circumstances." *Osterberger* at 230. Conversely, in *Harris,* this court affirmed an award of attorneys' fees. We held that in that case "[a]ttorneys' fees as 'restitution' would logically fall within category four." *Harris* at 448.

The point of comparing these cases is to show that there is no bright line rule for returning parties to the status quo after a court grants a rescission. The result can differ depending on the circumstances. On the issue of attorneys' fees, the result in both cases came down to an equitable balancing of benefits. We believe the same principle should apply to consequential damages when a court sits in equity. Rescission is an equitable remedy, and the decision by a court as to whether to award consequential damages unrelated to the contract should be driven by the equitable principles of fairness and justice. "Courts in equity must remain free to consider all equitable considerations and to fashion flexible remedies to meet the needs of justice on a case by case basis." *Umphres v. J.R. Mayer Enterprises, Inc.,* 889 S.W.2d 86, 91 (Mo.App. E.D.1994).

 With this in mind, we hold that the trial court did not err in refusing to grant damages to the Schlueters. The trial court was in the best position to analyze the circumstances and balance the equities accordingly. In any event, the record would not support an award of such damages. The Schlueters entered into the contract on September 28, 1994. On October 12, 1994, the Schlueters discovered Mr. Groothand's deposition from the Nail case, and informed their real estate agent that they wanted out of the deal. The period between these two dates is the only time the Schlueters could say they contracted to sell their house with the expectation of moving into the Groothands' house. However, the only evidence in the record of when the Schlueters contracted to sell their house is Mr. Schlueter's testimony that it was after the date they contracted to purchase the Groothands' house, September 28, and before the closing date, November 21, when they were forced to move out of their own home. Since the record is unclear, and the trial court made no specific findings as to when the Schlueters entered into the contract to sell their home, we must accept as true the evidence and inferences therefrom *that are consistent with the result reached below.* *T.B.G.,* 772 S.W.2d at 654; Rule 73.01(a)(3). Therefore, the trial court's judgment is affirmed.

## CONCLUSION

On the issue of whether the trial court erred in granting rescission to the Schlueters, the court's judgment is affirmed. The court's finding that the Groothands misrepresented the condition of the house is not against the weight of the evidence. The Schlueters therefore were entitled to rescission.

We also affirm the trial court's denial of consequential damages to the Schlueters. A court sitting in equity has substantial discretion to balance the benefits and fashion an appropriate remedy, and we find no error in its refusal to award consequential damages, particularly in light of the fact that it is unclear from the record when the Schlueters contracted to sell their home, and thus whether the Schlueters could reasonably have asked for such damages in the first place.

All concur.