Jacqueline BIGLER and Bruce Bigler, Plaintiffs–Respondents,

v.

Ronald G. CONN and Virginia Conn, Defendants–Appellants,

and

Cynthia Growcock and James Growcock, Defendants.

No. 21475.

Missouri Court of Appeals, Southern District, Division One.

Jan. 27, 1998.

Richard L. Schnake, Paul G. White, Springfield, for Defendants–Appellants.

Robert W. Stillings, Springfield, for Plaintiffs–Respondents.

PREWITT, Judge.

Plaintiffs sought damages for fraudulent misrepresentations in connection with the purchase of a business they bought from Defendants Conn. Following trial by jury, the jurors returned a verdict finding that Plaintiffs were entitled to actual damages of $116,250 from Defendants Conn, and $126,-000 in punitive damages from Defendant Ronald G. Conn. Judgment was entered in accordance with the verdict. Defendants appeal.

Defendants Conn contend that the trial court erred in its judgment against them, and in refusing to enter judgment for them notwithstanding the verdict because Plaintiffs failed to prove all of the essential elements of fraud. In reviewing the denial of a motion for judgment notwithstanding the verdict, this Court views the evidence in the light most favorable to plaintiffs and disregards all contrary evidence. *Pace v. Pacific Fire Protection District,* 945 S.W.2d 7, 8–9 (Mo.App.1997). The jury judges the weight of the evidence and credibility of the witnesses, and where reasonable minds can differ on factual questions before the jury, this court does not disturb the jury's verdict. *Id.* at 9.

The dispute in this case centers around the sale of a woodcarving business in Branson, Missouri. Jacqueline and Bruce Bigler, and Cynthia and James Growcock were co-buyers of the woodcarving business owned by Ronald G. and Virginia Conn. The Biglers filed suit against the Conns and against their co-buyers, the Growcocks. The Growcocks did not challenge the suit against them, and are not a party to this appeal.

The Conns listed their business and property for sale with Diane Routh, a broker/realtor, with Carol Jones Realtors in December 1992. The contract with Carol Jones was "for the sale of ... two pieces of property, the business and the real estate." Routh understood that the Conns wished to sell "one business with different functions in two different locations." More precisely, the property and entities for sale were a Missouri corporation known as Mountain Woodcarvers, Inc. and a wholly-owned subsidiary, known as Ozark Mountain Crafts Company. Mountain Woodcarvers, Inc. operated a retail store at Silver Dollar City, and conducted a mail order business. Ozark Mountain Crafts Company (OMCC) was organized to provide a source of supply for Mountain Woodcarvers.

The Conns owned real property located on Highway 65 upon which OMCC had a building where the woodworking and business operations were conducted. The Conns originally planned to sell this real estate, yet a sale did not occur but the real estate was instead leased to the Biglers and the Growcocks.

Ronald Conn apparently intended to sell his entire woodcarving business, the stock of Ozark Mountain Woodcarvers, Inc., the assets and inventory of both companies, the lease which Ozark Mountain held with Silver Dollar City, and the real property located on Highway 65. He prepared a "packet" of information which he provided to Routh for the purpose of distributing information to interested parties. Included in the packet was a statement that:

"The retail shop [at Silver Dollar City] is very profitable showing a net profit before taxes averaging $126,000 for the last five years. The production shop on Hwy 65 is basically a support facility showing only a slight profit each year."

The consolidated tax returns reflected profits substantially below $126,000. The statement in the packet regarding the income of the businesses became one of the bases for Plaintiffs' allegation of fraudulent misrepresentation.

Cynthia Growcock and James Growcock, husband and wife, and California residents at the time, became interested in Conns' business in 1993. Cynthia Growcock and the Growcocks' son (17 years of age at the time) looked at the business operation when they were in Missouri, and then returned to California to tell James about it. James Growcock became interested in this woodcarving business because of his son's excitement about the business and found the business description in the information packet provided by the Sellers' agent to be "very interesting." James Growcock testified that the statements made in the packet were important to him in his decision to purchase the businesses. In mid-April 1993, the Growcocks signed a sales contract, and deposited $5,000.00 earnest money.

The Growcocks knew the Biglers (also residents of California), and told the Biglers about the woodcarving business they had decided to purchase. Bruce Bigler was "kind of jealous" of the Growcocks and decided that he, too, wished to purchase the woodcarving business and move to Missouri. His wife, Jacqueline Bigler, would also be involved in the business and would take care of "doing payroll, taxes, and all phone and mail inquiries." The Biglers provided $5,000.00 for their share of the earnest money, without looking at the sales contract, and only later actually became a named party of the contract. The Biglers agreed to pay half of the purchase price.

The Growcocks eventually were unable to come up with their half of the purchase price, and so informed the Biglers. By that point, the Biglers had invested $55,000 into the purchase, and did not want to lose those funds, so they went forward with the purchase of the property, and planned to run the business jointly with the Growcocks. Closing

was initially set for August 31, 1993, but due to difficulties in obtaining funds, was continued several times upon agreement that the purchase price would be increased by $5,000.00. On November 3, 1993, the Buyers and Sellers appeared ready to close, but the checks tendered to Sellers were unacceptable, and the closing was again postponed to allow time for the Buyers to obtain cashier checks. Closing finally occurred on November 10, 1993. A promissory note in favor of the Conns was signed by the Growcocks and the Biglers for the balance of the purchase price.

The "Contract for Sale of Real Estate" is dated April 13, 1993, between Mountain Woodcarvers, Inc., as Seller, and James A. & Cynthia M. Growcock, as Buyers. The property described in the contract to be sold is as follows:

No Real Estate included in this sale.

All assets on [sic] Mountain Woodcarvers, Inc., including the company stock, the lease with Silver Dollar City, company name, inventories, fixtures and equipment. Business located at Silver Dollar City in Stone County, Missouri. Seller to provide $150,000 at cost inventory to be agreed upon by both buyer and seller. Fixtures and equipment per attached list.

It was later agreed at trial that the word "on" in the second sentence should have read "of." The list to describe fixtures and equipment to be sold was never attached.

The sales price was $460,000 with $40,000 (nonrefundable) to be paid at the time the contract was entered into. An addendum to the contract dated April 30, 1993, stated in part: "Seller to furnish xxxxx information verifying the profitability of the business." A word between "furnish" and "information" was crossed out and had initials by the mark-out, apparently the initials of the Growcocks. This addendum also specified that the "escrow money of $40,000 nonrefundable" was to be paid in two installments; the first $10,000 to be paid on April 30, and the balance to be paid by June. This addendum was signed by Ronald Conn and the Growcocks. By addendum dated September 16, 1993, the Biglers were added as "co-buyers."

Prior to closing, Ronald Conn transferred a total of $37,000 to himself as a shareholder, took two vehicles out of the business by re-titling them in his name and his wife's name, and sold some equipment of the business to C & D Last, Inc. The vehicles which had been assets of the business, were transferred to the Conns by a Bill of Sale dated August 31, 1993.

The equipment sold to C & D Last, Inc. was equipment no longer used by Mountain Woodcarvers, Inc. There was testimony that Conn contacted Jim Growcock to ask "if it would be okay to sell some equipment," and that the Growcocks and Biglers agreed to the sale to C & D Last. Conn received $5,000 for the equipment sold to C & D Last.

Appellants argue in Point I(A) and (B) that the "parties agreed that the buyers were not to rely upon pre-contract representations regarding the profitability of the business" because one addendum to the contract provided that the Conns were to "furnish information verifying the profitability of the business." Bruce Bigler testified that he was aware of the profitability verification provision. Appellants contend that as a matter of law, the Biglers had no right to rely upon representations made prior to the provision in the addendum.

Appellants conclude that the "profitability verification requirement thus amounted to a contractual agreement that the buyers did not intend to rely upon prior representations of how profitable the business was." Appellants rely on *Empire Gas Corp. v. Small's LP Gas Co.*, 637 S.W.2d 239 (Mo.App.1982) to support their argument that the profitability provision amounted to a contractual agreement. Respondent distinguishes *Empire Gas* by arguing that the Biglers had the right to rely upon the specific representations made in the packet because there was "no mutual recognition of the uncertainty of a given fact" as required by the court in *Empire Gas*. The Conns were to verify the profits, but their uncertainty was never acknowledged by them.

This Court stated in *Empire Gas* that, to recover for misrepresentation, "it must be established that the one allegedly defrauded relied upon the truth of the representations

claimed to be false. Where there is a mutual recognition of the uncertainty of a given fact, it cannot be said that either party relied on or had a right to rely upon that fact." 637 S.W.2d at 243. In the present case, the Biglers did not recognize an uncertainty regarding the amount of profitability of the business. The Biglers testified they decided they "could make it with those figures" represented in the packet. When Bruce Bigler was asked at trial "what impact . . . those representations by Mr. Conn" regarding profits had upon his decision to buy the stock of Mountain Woodcarvers, Bigler responded that they had "quite an impact." Significantly, Bigler discussed these numbers with the Growcocks and "didn't think there was any question in anybody's mind about [the profits]." Therefore, as Respondent concludes, *Empire Gas* is distinguishable from the present case and does not apply.

The jury could have believed that the Biglers relied on this statement rather than on the figures reported in the consolidated tax returns reviewed prior to closing. The tax returns showed that the net profit for the years 1987 through 1991 averaged $40,051.00. Although there was testimony regarding the income and losses of the business reported on the consolidated tax returns and reason to believe that the Biglers should have relied on this information, the "resolution of conflicts in testimony are not matters for appellate review," but are factual issues to be resolved by the jury. *Martin v. Durham*, 933 S.W.2d 921, 925 (Mo.App.1996).

■ The Biglers' so-called investigation, if any, into the profitability of the business was a factual matter in dispute for the jury's consideration. Jacqueline Bigler testified that the examination of the books was not for the purpose of verifying the profitability, but was a training session. Also in dispute was whether the Biglers were furnished the tax returns. We conclude here that the right to rely on the representation as to the profitability of the business was a question for the trier-of-fact. "The right to rely on a representation is ordinarily a question of fact for the jury." *Colgan v. Washington Realty Co.*, 879 S.W.2d 686, 690 (Mo.App.1994). *See also*

*Fields v. Mitch Crawford's Holiday Motors Co.*, 908 S.W.2d 877, 880 (Mo.App.1995).

■ "The mere presence of opportunities for investigation will not of itself preclude the right of reliance." *Iota Management Corp. v. Boulevard Inv. Co.*, 731 S.W.2d 399, 414 (Mo.App.1987). We are not convinced that the evidence establishes a "independent investigation," but even if so, if there was even a partial investigation the party may still be able to rely in part upon the investigation and in part upon the representation of the adverse party and if deceived "by such representation to his injury, it is held the he has a right to rely on, and may maintain an action for, such deceit." *Colgan*, 879 S.W.2d at 690–91. *See also Iota Management Corp.*, 731 S.W.2d at 413.

■ Even with an independent investigation there can be reliance if the parties are not on equal footing and the facts are particularly within the knowledge of the party making the representation and difficult for the other party to ascertain. *Colgan*, 879 S.W.2d at 691. *See also Brennan v. Molina*, 934 S.W.2d 631, 635 (Mo.App.1996). It is further said that "even if the parties stand on equal footing, if the seller makes a distinct and specific representation, the buyer has the right to rely thereon," and "whether the parties are on equal footing is ordinarily a question for the fact finder." *Colgan*, 879 S.W.2d at 691. *See also Groothand v. Schlueter*, 949 S.W.2d 923, 930 (Mo.App. 1997).

We conclude that the right to rely and whether, in fact, the party did, was a question for the jury, who apparently determined that issue in favor of the Plaintiffs. Having concluded that a submissible case was made upon the misrepresentation of the profitability of the business, a fact not disputed, whether there were also other fraudulent misrepresentations need not be addressed. As the trial court did not err in failing to grant judgment notwithstanding the verdict or a new trial because a submissible case was made, Point I is denied.

For his second point, Appellant Ronald Conn contends that the trial court erred in entering judgment for punitive damages be-

cause fraud was not proven and that the punitive damages awarded were excessive. We do not need to address the question of proving fraud, as that was covered in our discussion on Appellants' first point.

Defendant Ronald G. Conn states that punitive damages were excessive because there was no evidence that he acted with malice. It is now undisputed but that the statements regarding the profitability were wrong and no justification for making those statements has been shown. The evidence reflected a background of Mr. Conn indicating that he should have known how to accurately assess the profitability, particularly of a business where he was one of the owners.

"Awarding punitive damages is peculiarly committed to the jury and trial court's discretion and the appellate court will interfere only in extreme cases." *Fust v. Francois*, 913 S.W.2d 38, 50 (Mo.App.1995). "Punitive damages must in general bear some relation to the injuries and the manner of their infliction." *Id.* An abuse of discretion in the award of punitive damages "is established when the punitive damages award is so disproportionate to the factors relevant to the size of the award that it reveals improper motives or a clear absence of honest exercise of judgment." *Call v. Heard*, 925 S.W.2d 840, 849 (Mo. banc 1996). Punitive damages must be related to the wrongful act and the actual or potential injury, although there is no fixed mathematical relation between actual and punitive damages. *Id.* Under the circumstances of this case, we conclude that the punitive damages are sufficiently related to the actual damages and the other circumstances of the case. Point II is denied.

The judgment is affirmed.

GARRISON, P.J., and CROW, J., concur.